Dinsmore *v.* Boyd.

W. B. DINSMORE *v.* COLEMAN BOYD *et al.*

1. WRIT OF ERROR CORAM NOBIS. *Petition without merits. When.* Where, after due service of process, a judgment by default has been taken according to the course of the court, a petition for a writ of error *coram nobis* to set aside the judgment is without merits, it appearing that the petitioners employed counsel to defend who failed to mark his name to the case, or see the plaintiff's counsel, or attend the sittings of the court under a misapprehension as to the character of business to be transacted, a large number of similar judgments having been taken, one of which was against the same petitioners which they have never sought to set aside, the court continuing open for eight days, and holding sessions during five of those days, the substance of its proceedings being noticed in the daily papers and seen by the defendants.

2. SAME. *Same. Petition defective which relies on errors of law and not of facts.* A petition for a writ of error *coram nobis* is fatally defective which relies upon errors of law without assigning any error of fact sufficient to justify a reversal of the judgment.

3. ASSIGNEE OF A DECREE. *Attaching creditors. Priority.* In a contest over a fund, impounded for the satisfaction of a decree, between an assignee of the decree, who has failed to notify the debtor of the assignment, and a subsequent attaching creditor of the assignor, who has failed to make the debtor a party to his bill, and the fund is not paid into court until long after the filing of the bill, the assignee has the prior equity and is entitled to the fund.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. R. J. MORGAN, Ch.

HUMES & POSTON for complainant.

GANTT & PATTERSON, W. M. RANDOLPH and C. F. VANCE for defendants.

44—VOL. 6.

COOPER, J., delivered the opinion of the court.

In the year 1866, the firm of Stedman Brothers & Co., then engaged in keeping the Overton Hotel in Memphis, bought, through B. B. Waddell, one of its members, in the city of New York, a large amount of furniture and fixtures for the hotel, partly from Henry Bruner, partly from A. T. Stewart & Co., and partly from E. V. Haughwont & Co. As a part of the contract made with each of these vendors, it was agreed that the purchasers would give a chattel mortgage on the furniture bought to secure the purchase price. Before the furniture was delivered, one of the Stedman brothers died, and B. B. Waddell, W. H. Stedman and C. B. Galloway, under the style of Waddell, Stedman & Galloway, became the successors of the previous firm, and agreed to receive and pay for the furniture on the same terms. They accordingly gave their notes for the price, and executed the chattel mortgages to the several vendors as stipulated by the contract. The notes given to Henry Bruner bore date November 26, 1866, were signed in the firm name, and made payable to B. B. Waddell and Samuel Stedman, at intervals of a month, beginning at five months and ending with twenty-four months after date, each for $1,127.57, and aggregating $22,551.40. The notes were delivered to Bruner with the endorsement of Waddell alone, Samuel Stedman, who was expected to endorse them for the accommodation of the makers, having declined to do so. The mortgage was executed by B. B. Waddell, C. B. Galloway and

W. H. Stedman, on the 15th of February, 1867, and conveyed the property to Henry Bruner to secure the purchase notes, describing them, with power in Bruner, on default of payment, to take possession of the furniture "and sell and dispose of the same for the best price he can obtain." Afterwards, during the same year, Stedman and Galloway sold out their interest in the property and business of the firm to Waddell, and Coleman Boyd and S. B. Robbins became equal partners with Waddell in the property and business, continuing to conduct the hotel under the partnership name and style of S. B. Robbins & Co. On the 29th of May, 1867, after the formation of the new firm but in pursuance of the agreement under which it was entered into, the members of the new firm signed in their individual names an undertaking in writing on the back of the chattel mortgage to Bruner to the following effect: "We, S. B. Robbins, B. B. Waddell and Coleman Boyd, partners under the name and style of S. B. Robbins & Co., having become the owners of the within described furniture in the Overton Hotel, hereby assume the payment of the within described notes, and become bound for the payment of the same."

Subsequently, and before the expiration of the year 1867, Waddell and Boyd retired from the firm, selling out to S. B. Robbins & Co., the new firm agreeing to assume the liabilities of its predecessor. There is a conflict of testimony at this point. Waddell and Boyd, it seems, thought that they were selling to S. B. Robbins and H. B. Plant, who were to continue

the business under the old name. The negotiations were conducted and the trade made with Robbins alone, and he and Plant both say that Plant was no party to it, and only came in a month or two afterwards under an arrangement with Robbins alone. The question of Plant's liability for the debts of the new firm, until he did actually form a partnership with Robbins, seems to have been tested in the courts, and found in favor of Plant.

. On the 1st of April, 1868, Robbins and Plant conveyed all of the furniture, fixtures, &c., of the Overton Hotel to W. B. Dinsmore and T. B. Blackston in mortgage to secure an indebtedness of $50,000, recited to be for borrowed money. In the spring of 1869, the original mortgagees, Bruner, Stewart & Co. and Haughwont & Co., demanded possession of the chattels severally mortgaged to them, and the possession was surrendered to them by Robbins and Plant. It was desirable to retain the property for the hotel, and negotiations were entered into which resulted in the selection, chiefly by the mortgagees through their counsel, of suitable persons to value the chattels, with an understanding that the mortgagees would sell at the valuation, thus releasing the property, and leaving the mortgagees to look to the persons liable on the notes for the residue of the amount due them. The valuation was made, and Bruner and Stewart & Co. accepted the valuation as correct, the price fixed upon the articles in Bruner's mortgage being $10,600. Each of the parties received from Robbins and Plant the value thus ascertained in satisfaction of the mortgage.

Houghwont & Co. were not satisfied with the valua-
tion put upon their chattels, and they demanded and
received a much larger sum. On the 4th of June,
1869, Bruner sold and transferred to W. B. Dinsmore
all his right, title and interest in his chattel mort-
gage, the transfer reciting a consideration of $12,000,
authorizing him, at his own cost and expense, to "take
all legal means for the collection of the money due
on said mortgages, and to acknowledge satisfaction,"
&c. The assignment is, in terms, of Bruner's inter-
est in the mortgage, but the notes were set out therein
in *hæc verba*, and were delivered to Dinsmore with
the mortgage. The mortgage and notes were sent to
Memphis and placed in the hands of a lawyer for
collection. Suits were brought on the notes, which
were not paid by the proceeds of the sale of the
mortgaged property, against Waddell, Galloway and
Coleman Boyd, the latter by reason of his written
assumption of the 29th of May, 1867. The summons
on these suits was returnable to the 3d of August,
1869, and was executed on the defendants about the
20th of July. The declaration was filed on the 5th
of August, and judgments final by default taken on
the 9th of August, 1860. The bill before us was
filed on the 31st of the same month, after the return
of an execution *nulla bona*, to reach, for the satisfac-
tion of these judgments, the interest of Coleman Boyd
in certain realty and choses in action. Afterwards, a
writ of error *coram nobis* was sued out in the law
court by Boyd, Waddell and Galloway, which was
pending when that court was abolished by statute.

Thereupon, by consent entered of record in this cause, it was agreed that "the merits of the writ of error *coram nobis*" might be tried in the chancery court as in the law court, at the same time the right of the complainant to relief is heard and disposed of, so as to determine the whole matter involved in both courts at the same time. The proof, it was further agreed, should be in writing, and the cause heard by the chancellor without a jury. Upon the final hearing, the chancellor rendered a decree in favor of the complainants, from which Coleman Boyd appealed. During the pendency of the suit, one A. M. Boyd intervened, and set up claim by assignment from Coleman Boyd to one of the choses in action, in the form of a chancery decree in favor of Coleman Boyd against Valentine Werner, which the bill sought to subject. The chancellor dismissed the bill as to this point, and also dismissed A. M. Boyd's intervening petition. From this part of the decree both the complainant and A. M. Boyd appealed.

The record does not show the situation of the proceedings under the writ of error *coram nobis* in the law court at the time the parties agreed to a transfer of the litigation to the chancery court. It merely contains the petitions for writs of error with affidavits accompanying each petition, and those affidavits, with the cross-examination of some of the affiants, and one or two depositions in addition. The consent order, removing the litigation to the chancery court, seems to have been made on the 7th of June, 1870. Perhaps it is useless to find fault with this experiment

of counsel to give the chancery court jurisdiction, by consent, of a matter over which the court clearly has no jurisdiction, when, by legislation and otherwise, the distinction between courts of law and courts of equity is so rapidly disappearing. But we think counsel might well have been a little more specific as to what they want us to determine. What are the merits of a writ of error *coram nobis* upon which proof is admissible? If the proceedings had continued in the law court, we should either have had a motion to dismiss the petition for the writ of error, or an assignment of errors and a demurrer thereto, or an issue made upon the truth of the facts assigned. In the record before us, there is no motion to dismiss, no assignment of errors, no demurrer, and no joinder of issue. Under these circumstances, the safest course for us, of which the parties cannot complain, is to follow the course of the argument in this court, without undertaking to construe the words of the agreement for ourselves.

Both parties have argued this point of the case as if they meant by the "merits of the writ," the sufficiency of the causes assigned for not having made defense to the suits at law, their sufficiency to be tested not merely by the statements of the petition but by the evidence introduced. The causes assigned in the petition are substantially—1. That public notice was given that no judgment by default should be taken at the August term. 2. That it was publicly announced that no other business except such as parties might be entitled to on the first day of the term as

of course should be taken up. 3. That counsel were informed by the judge that judgment by default would not be allowed. 4. That the petitioners' counsel applied on the 4th of August, in order to put in pleas, but found no declaration filed. 5. That there was an understanding between petitioners' counsel and the counsel for the creditors that neither would take a judgment by default against the other without notice.

The writ of error *coram nobis* lies, for the correction of a material error of fact, where the applicant has had no notice of the proceedings, or was prevented from making defense by surprise, accident, mistake or fraud, without fault on his part: Code, secs. 3110, 3116. The petitioners had due notice of the suit and employed counsel. There was no fraud upon the part of the plaintiff or his counsel. Was there either surprise, accident or mistake "without fault" on the part of the petitioners? The petitioners' counsel called for the papers on the second day of the term, and found no declaration, but the plaintiff had until the next day to file his declaration. It is said there was an agreement between the counsel of petitioners and the counsel of the creditors that neither would take a judgment against the other without notice. But it is not stated that the counsel of the creditors knew of the retainer of the counsel of the petitioners, and the latter failed to mark their name to the docket. And it is doubtful whether an "understanding" between individual members of the bar, as a matter of courtesy, will avail in the absence of a rule of practice on the subject: *Gullena* v. *Sudheimer*, 9 Heisk., 189. A pub-

lic notice or announcement of the order of business cannot be acted upon, without negligence, unless it appears to have been made or authorized by the court: *Thruston* v. *Belote,* 12 Heis., 249. And a party cannot be said to be without fault who undertakes to act upon his understanding of the language of a judge out of court, when the proceedings in court show that the language was misunderstood. A litigant must be diligent, and must comply with the requirements of the law, and not rely upon the casual remarks of officers of the court: *Mahalovich* v. *Vaughn,* 1 Baxt., 325. Moreover, the petition makes exhibits certain notices in the daily papers of the 3d, 9th and 10th of August of the proceedings of the court, and the notices of the 4th and 9th show the taking of judgments by default on those days, and on the latter day the execution of writs of inquiry. As a matter of fact, the court was open on the 3d, 4th, 9th, 10th and 11th of August, and about twenty judgments by default were taken. Among others, A. T. Stewart & Co. took a judgment by default against defendants Waddell and Boyd for $4,499.83, being the balance of the original notes executed to them, after deducting the proceeds of the chattel mortgage at the valuation price. No step has ever been taken to set this judgment aside, and a bill was filed upon it, after the filing of the present bill, to reach the same property. A judgment by default for want of proper pleadings in time is a judgment of course, and, if there has been any surprise, accident or mistake, it cannot be said that injury has accrued to the peti-

tioners "without fault on their part." The decision on the "merits of the writ" must be against the petitioners.

We are the better satisfied with this conclusion because the record fails to establish any error of fact which would justify a reversal of the judgment. An error of law cannot be reached in this mode: *Patterson* v. *Arnold*, 4 Cold., 364. Most of the errors relied upon, not in the petition itself for that contains no assignment of errors, but in the affidavit of Waddell, which is made an exhibit to the petition, are of the latter character. Whether the title to the notes sued on passed to Bruner by the endorsement of Waddell alone, and to Dinsmore by delivery, and whether the undertaking of Waddell and Boyd, by their endorsement of the 29th of May, 1867, gave to Bruner, or Dinsmore as his assignee, a right of action against them, were questions of law arising upon the record then before the court: *Upton* v. *Philips*, 11 Heis., 215. The obligation created by the written assumption, being based upon the contract and being the consideration for the interest acquired, was clearly not a *nudum pactum*, because executed after the trade had been made, and, as a majority of this court has held, enured to the benefit of the mortgagee without an extinguishment of the original debt: *Moore* v. *Stovall*, 2 Lea, 543. The notes sued on were certainly not extinguished by the transaction in the spring of 1869, by which Bruner sold the mortgaged chattels at valuation. By the mortgage, he was authorized to take possession and dispose of them for the best price

Dinsmore *v.* Boyd.

he could obtain. The valuation, so far as appears, was a fair and full one. There is no pretense for the suggestion that the price was received in full satisfaction of the entire mortgage debt. The defendant Boyd in his amended answer, filed in April, 1876, alleges that the purchase of the unpaid notes was really made by Robbins and Plant, and not by Dinsmore. All that can be said of the case made in support of this allegation is, that it raises a suspicion which cannot prevail against the positive swearing of Dinsmore, Plant and Robbins. The chancellor's decree on this branch of the case is correct, and must be affirmed with costs.

The remaining question arises upon the petition of A. M. Boyd, and involves the priority of right between him and the complainant to a decree rendered by the chancery court, on January 18, 1867, in favor of Coleman Boyd against one Valentine Werner for $4,023.04, with interest from January 7, 1867, on which, however, there had been paid, on February 10, 1867, $1,132.09. Several creditors of Valentine Werner, and among others, Coleman Boyd, had filed separate attachment bills against him, and had attached valuable realty. The suits were consolidated, and the land sold, on August 14, 1866, under orders of the court. One J. S. Stanton had become the purchaser, at the price of $12,000, for which he executed his two notes for $6,000 each, payable to the clerk and master at six and twelve months. The decree of the 18th of January, 1867, ascertained the debts of the several creditors, and directed them to be paid in the

order of their attachments, Coleman Boyd's attachment
being the last.    After rendering a decree in favor of
each creditor, against Valentine Werner for the amount
due him, the court directed the master to apply the
proceeds of the Stanton notes, first, to the payment
of costs, next to the payment of the prior claims,
naming them, "and lastly, he will pay said Coleman
Boyd his said debt and interest, and he will, upon
the payment in of said funds, pay out the same as
above directed without the further order of the court,"
any balance being reserved.    The fund for the benefit
of Coleman Boyd had not been paid into court at the
filing of the bill of complainant in this case, nor until
long afterwards, the purchaser Stanton having litigated
his liability.

The complainant's right to this fund dates from
the filing of his bill, to which the clerk and master
of the court, but not Valentine Werner, is made a
party.    A. M. Boyd claims the fund under an assign-
ment to him, in writing, by Coleman Boyd, of the
decree on October 1, 1868, which was filed in the
cause on the 5th of the same month, and a written
notice of the assignment mailed to Valentine Werner
at Canton, Mississippi, his place of residence, about
the same time.

The assignment of a judgment or decree, as of any
other *chose in action,* carries to the assignee an equi-
table right to the fund which is good between the
parties, and will authorize the assignee to receive the
money from the debtor, or enforce collection in the
name of the assignor.    If the debtor pay the debt

to the assignor before notice of the assignee's rights, he cannot be made to pay it again. And if, before the assignee notifies the debtor of his right, the assignor make a valid assignment to a third person who does give notice thereof to the debtor, or if a creditor of the assignor attach or otherwise judicially seize the fund, the first assignee will lose the benefit of his assignment. The reason is, that by neglecting to perfect his right in the mode required by law, he leaves the assignor in the ostensible ownership of the chose, and third persons are induced to act on the faith of such ownership. If, however, the subsequent assignee or the creditor has not perfected his right by notice to the debtor, it is a contest between equities, and the first assignee must prevail, upon the maxim that he who is first in time is first in right.

In the case before us, A. M. Boyd has a valid assignment from Coleman Boyd of his decree against Valentine Werner made on October 1, 1868. The complainant filed his bill to reach the fund represented by the decree on the 31st of August, 1869, but did not make Valentine Werner a party defendant, nor, so far as appears, has he ever notified him in any way of his proceedings. The petitioner, A. M. Boyd, is clearly first in point of time, which gives him the superior equity, and must prevail unless there is something else in the case to change the rule.

The complainant insists that Coleman Boyd, by virtue of his decree of the 18th of January, 1867, became entitled to the fund represented by the Stanton debt, Werner being thereby released and his in-

debtedness extinguished, and that he, complainant, has acquired the prior right to this fund by notice to the clerk and master, to whom the money was to be paid in trust for Coleman Boyd. But if the complainant has never acquired any right to the decree against Werner prior and superior to the right of A. M. Boyd, the fund evidenced by the decree belongs not to Coleman Boyd, but to A. M. Boyd, and complainant took nothing by his bill. Besides, the complainant is mistaken in saying that the decree extinguished Werner's indebtedness. If the Stanton debt had been lost by the insolvency of Stanton and his surety, and the realty had been resold for less than would pay the Boyd debt, the loss would have fallen on Werner. The fund would not belong to the judgment creditor until paid into court: *Byers* v. *Wheatley*, December term, 1880.

The decree below will be affirmed as to the complainant with costs, but modified so as to declare that A. M. Boyd is entitled to the proceeds of the decree of the 18th of January, 1867.