# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 5, 2006 Session

## STATE OF TENNESSEE v. ROBERTO VASQUES, KEVIN JOEL HERNANDEZ, LUIS MARTIN VASQUEZ, HECTOR ALONZO, AND VICTOR HUGO GARZA[1]

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2000-D-1876     J. Randall Wyatt, Jr., Judge**

**No. M2004-00166-SC-R11-CD - Filed on March 9, 2007**

Our grant of the applications for permission to appeal filed by the State of Tennessee and certain of the defendants was for the purpose of determining (1) whether the evidence at trial was sufficient to support the convictions for conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone; (2) whether the waiver of lesser-included offense instructions under Tennessee Code Annotated section 40-18-110 violates constitutional principles; and (3) whether the Court of Criminal Appeals applied the proper standard in affirming the grant of coram nobis relief to Vasquez and Garza, reversing the trial court, and denying the relief to Vasques, Hernandez, and Alonzo. We conclude that the trial evidence was sufficient to support the convictions and that the statutory waiver of the entitlement to complete jury instructions does not violate the right to a jury trial or the separation of powers principle. We also hold that Vasquez and Garza are entitled to a new trial based upon newly discovered evidence and that Vasques, Hernandez, and Alonzo are not entitled to coram nobis relief. In consequence, the judgments of the Court of Criminal Appeals are affirmed.

**Tenn. R. App. P. 11 Appeal by Permission; Judgments of the Court of Criminal Appeals Affirmed**

GARY R. WADE, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and CORNELIA A. CLARK, J., and ADOLPHO A. BIRCH, JR., SP. J., joined. JANICE M. HOLDER, J., concurring and dissenting.

---

[1] Another defendant, Luis D. Vidales Romero, filed an application for permission to appeal to this Court that was dismissed as untimely. Thereafter, the Court of Criminal Appeals vacated and reinstated its opinion to give Romero the opportunity to file a timely Rule 11 application. Meanwhile, this Court granted the applications of the remaining defendants.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and John C. Zimmerman, Assistant District Attorney General, for the appellant/appellee, State of Tennessee.

Jerry Gonzalez, Nashville, Tennessee, for the appellant, Roberto Vasques.

James O. Martin, III, Nashville, Tennessee, for the appellant, Kevin Joel Hernandez.

John G. Oliva, Nashville, Tennessee, for the appellee, Luis Martin Vasquez.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Hector Alonzo.

Dwight E. Scott, Nashville, Tennessee, for the appellee, Victor Hugo Garza.

**OPINION**

Roberto Vasques ("Vasques"), Luis D. Vidales Romero ("Romero"), Kevin Joel Hernandez ("Hernandez"), Luis Martin Vasquez ("Vasquez"), Hector Alonzo ("Alonzo"), and Victor Hugo Garza ("Garza") were convicted of conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone, a class A felony. Tenn. Code Ann. §§ 39-17-417(i)(13) (Supp. 2000), 39-17-432(b) (2003). They were each sentenced to fifteen years in the Department of Correction. After the trial, the imposition of sentences, and the denial of the motions for new trial, the defendants discovered that Tennessee Bureau of Investigation ("TBI") Agent Patrick Howell, an officer who had testified for the State, was using cocaine, some of which he had stolen from the state crime laboratory. The appeals of the defendants to the Court of Criminal Appeals were stayed and each of the defendants filed petitions for writ of error coram nobis asking for new trials.

**Evidence at Trial**

On April 18, 2000, Jose Rodriguez ("Rodriguez"), who had been arrested for drug offenses, informed TBI Agent Howell and other officers that the suppliers of his illegal drugs could be found at two locations, 1035 and 1147 Antioch Pike in Nashville, Tennessee. In cooperation with the police, Rodriguez telephoned his supplier, "David," who was later identified as Romero, and arranged to buy one hundred pounds of marijuana at a carwash on Nolensville Road. Officers with the TBI and the Metropolitan Police Department cooperated in the investigation.

Police Detective Jessie Birchwell and approximately fourteen other officers established surveillance at both of the Antioch Pike houses and also at the Nolensville Road carwash. Detective Birchwell observed two men in a white Toyota Camry meet Rodriguez at the carwash. The driver, who was wearing a white football jersey and was later identified as Romero, got out of the Camry and entered Rodriguez's car. Meanwhile, a man in a gray van was parked nearby. He appeared to

be talking on a radio. When Romero left the Rodriguez vehicle and drove away in his Camry, the gray van remained at the carwash.

About thirty minutes later, Romero and a passenger later identified as Hernandez returned to the carwash in the same Camry. They were followed by a white Ford Taurus. A black Pontiac Firebird occupied by two Hispanic males was driven into a nearby parking lot. The individuals in the Firebird had an "unobstructed view" of the carwash. When an officer who had been monitoring Rodriguez's conversation with his suppliers gave the "take down" signal, Detective Birchwell drove into the carwash and was able to arrest Romero, who had tried to flee. Hernandez remained in the Camry. A loaded handgun and a walkie-talkie were found in their vehicle.

Vasques fled from the white Taurus and ran toward Nolensville Road before being tackled by Officer Rob Forrest. A loaded handgun was found in a carwash bay near where Vasques had run. Alonzo, who was seated on the passenger side of the Taurus, was taken into custody by Detective John Donnegan. Three trash bags in the trunk of the Taurus and another on the ground behind the vehicle contained approximately one hundred pounds of marijuana. By the time the four men had been arrested, the gray van had been driven from the scene.

During the period of surveillance, Police Officer Herbert Kajihara watched the Firebird traveling slowly through a Dairy Queen parking lot before it was parked in a Burger King parking area within view of the carwash. The vehicle's occupants, whom Kajihara described as "slouched" down in their seats and "looking back and forth," stayed in the car. When the take-down signal was given, Kajihara approached the Firebird, which Detective Leon Taylor had blocked with his car. The suspects in the Firebird, who were later identified as Garza and Vasquez, made no effort to avoid arrest.

At trial, Detective Taylor testified that prior to the arrests, he had followed the Camry from the carwash to a Walgreens at the corner of Antioch Pike and Nolensville Road. The Camry was met there by the white Taurus. Detective Taylor continued to watch as the Taurus was driven from the parking lot and proceeded along Antioch Pike before being returned to the Walgreens some ten minutes later. The black Firebird followed the Taurus. Taylor assisted in the arrest of Garza and Vasquez. Although a loaded shotgun was found behind the front seat of the Firebird, Taylor found no evidence of illegal drugs in the vehicle.

TBI Agent Howell, who was involved in the initial arrest of the informant Rodriguez and was a part of the surveillance team near the carwash, witnessed the black Firebird being parked in the Dairy Queen parking lot. According to Agent Howell, the Firebird's occupants left the Dairy Queen after glancing toward the carwash and then parked near the Burger King. He described the two men as continuously looking straight ahead and observed that neither left the vehicle. Agent Howell, who did not participate in the arrests, identified Vasquez and Garza as the occupants of the Firebird.

Metropolitan Police Officer Thomas Rollins likewise testified that shortly before the arrests, he saw the Taurus occupied by Hispanic males enter the driveway at 1147 Antioch Pike. He saw the

driver knock on the door and stand there for a few minutes before returning to his vehicle and driving to 1035 Antioch Pike. No one got out of the car at that location. Shortly thereafter, two Hispanic males arrived in the black Firebird, got out of their vehicle, and walked toward the back of the residence. The Taurus left the residence first and the Firebird followed, each being driven to the Walgreens where the Camry was already parked.

Metropolitan Police Detective Mike Clark, who had also provided surveillance at the carwash, trailed the Camry from the carwash to the Walgreens. At trial, Clark testified that as the two cars traveled from the residences on Antioch Pike toward the Walgreens, they passed by Glencliff Elementary School, Glencliff High School, and Wright Middle School. He measured the distance from Glencliff Elementary School to Antioch Pike at 200 feet and he determined that Glencliff High School was 202 feet from the road. The officer testified that Wright Middle School was 222.6 feet from Antioch Pike and that the Walgreens was only eighty-one feet from Radnor Baptist Elementary. He also concluded that Radnor Baptist Elementary was "just shy" of one thousand feet from the carwash.

Following the arrests of the defendants, the officers obtained a search warrant for the houses located at 1035 and 1147 Antioch Pike. At the 1035 Antioch Pike address, they found a safe containing money, electronic scales, marijuana, ammunition, a loaded handgun magazine, and a box to a Glock model 26 handgun. At the 1147 Antioch Pike address, they found a Glock model 26 handgun, ten trash bags each of which contained twenty-five one-pound baggies of marijuana, a ledger containing records of amounts paid and drugs shipped, eight one-pound bags of marijuana, and a shotgun. The bags for the marijuana were identical to the bags found in the Taurus occupied by Vasques and Alonzo.

The evidence found at the scene and at the two houses on Antioch Pike was secured, sealed, and sent to the lab for testing. TBI forensic chemist Donna Flowers testified that the marijuana in the Taurus weighed 93.8 pounds and that the marijuana confiscated at 1035 Antioch Pike weighed 250.5 pounds. TBI forensic scientist William H. Stanton, Jr., testified that the marijuana found at the 1147 Antioch Pike residence weighed 21.2 pounds.

Upon this evidence, the jury returned verdicts of guilt as to each of the defendants.

### Evidence Presented During Coram Nobis Hearing

Shortly after the denial of the motions for new trial, officials within the District Attorney General's office informed defense counsel of TBI Agent Howell's misconduct. Based upon this information, the defendants filed petitions for writ of error coram nobis.

The statute authorizing the writ provides in pertinent part as follows:

(a) There is made available to convicted defendants in criminal cases a proceeding in the nature of a writ of error coram nobis, to be governed by the same rules and

-4-

procedure applicable to the writ of error coram nobis in civil cases, except insofar as inconsistent herewith. Notice of the suing out of the writ shall be served on the district attorney general. No judge shall have authority to order the writ to operate as a supersedeas. The court shall have authority to order the person having custody of the petitioner to produce the petitioner in court for the hearing of the proceeding.

(b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

(c) The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105 (2006).[2]

As indicated, Agent Howell, the lead TBI agent in the investigation of the defendants, had been involved in the arrest of the informant Rodriguez, who arranged the drug transaction with the defendants. At the hearing, Agent Howell acknowledged that he began using cocaine in 1997 or early 1998. Although he had taken a leave from the TBI for treatment in February 1998, he returned a year and a half later and he began using cocaine again as early as July 2000. By 2001, he was using cocaine twice a week. He conceded that he sometimes paid prostitutes with cocaine. Agent Howell testified that he got small quantities of the drug through undercover buys or from evidence that he had checked out of the TBI laboratory. He admitted using duct tape or adding baking soda in order to hide the change in the total weight of the cocaine. Agent Howell claimed he had not used the drug while he was on duty but acknowledged that he had stolen cocaine from an evidence file on the day after the defendants' trial was concluded.

Agent Howell testified that some five months after the trial, he reported his actions to his supervisor, TBI Agent Roy Copeland, and to Detective Clark. Although his bank records indicated that he had eleven different accounts and that some of the accounts contained more than $100,000, Agent Howell denied ever having an account of that scope and suggested that the accounts might have been set up for TBI purposes. Agent Howell pleaded guilty to two counts of tampering with

---

[2]Because there have been no substantive changes to the statute since the 1978 amendment discussed more fully below, we will cite to the current volume of the code.

evidence, was sentenced to three years in a community corrections program, and was required to attend a drug court program.

At the hearing, Detective Birchwell confirmed that Agent Howell's arrest of Rodriguez had led to the investigation of the defendants. Although he had no recollection of being present when Rodriguez called his supplier or whether he had even participated in setting up the transaction, Birchwell stated that it was possible he was there because Agent Howell often worked closely with the Metropolitan Vice Unit. On questioning, Detective Birchwell acknowledged that in his opinion, an officer who had a cocaine problem should not participate in a criminal investigation due to his untrustworthiness.

Detective Clark explained that he did not report Agent Howell's conduct because Agent Howell had already informed his TBI supervisor. Clark testified that neither he nor any other officer was aware of Agent Howell's illegal activity during the defendants' trial. Clark admitted, however, that since being made aware of the circumstances, he had informed others about Agent Howell's criminal behavior.

After considering the testimony, the trial court granted each petition for writ of error coram nobis, ordering a new trial for all six defendants. The trial court concluded that "former Agent Howell's role in the investigation and prosecution of this case was vital in obtaining convictions" and that had the information been available during the trial, Agent Howell could have been effectively cross-examined about his drug use and criminal activity, shedding doubt about the culpability of the defendants. The trial court ruled that Agent Howell's credibility would have been an issue and that alternate defenses might have been available:

> [A] reasonable jury, informed of former Agent Howell's drug use and criminal acts, may have chosen to reject all or part of his testimony. This information may have also caused the jury to question the integrity of the entire investigation in spite of the diligent and professional efforts of members of the Nashville Police Department Vice Squad in the investigation and apprehension of the Petitioners in this case.

The State appealed the decision. After consolidating the State appeal with the pending appeals of each defendant, the Court of Criminal Appeals concluded that while the evidence was otherwise sufficient to support each of the convictions and that the trial court's failure to instruct the jury on lesser-included offenses was not reversible error, the grant of coram nobis relief should be upheld only as to Vasquez and Garza and reversed as to Vasques, Hernandez, Alonzo, and Romero. This Court granted applications for permission to appeal filed by the State as to Vasquez and Garza and by the defendants Vasques, Hernandez, and Alonzo.

## SUFFICIENCY OF THE EVIDENCE

A threshold question is whether the evidence at trial, without regard to the evidence about Agent Howell offered at the hearing on the petition for writ of coram nobis, was sufficient to support

the convictions. Each of the five defendants contend that the State failed to prove that they entered into an agreement to sell marijuana in a school zone; failed to prove that they were within one thousand feet of a school zone while in possession of the marijuana; and failed to prove that they committed overt acts in furtherance of the conspiracy. The defendants maintain that the circumstantial evidence failed to exclude every other reasonable hypothesis except for their guilt.

When considering a sufficiency of the evidence question on appeal, the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). The same standard applies even if the evidence is entirely circumstantial. State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

Here, the defendants were charged with conspiracy, an offense that requires the prosecution to prove that

> two (2) or more people, each having the culpable mental state required for the offense which is the object of the conspiracy and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct which constitutes such offense.

Tenn. Code Ann. § 39-12-103(a) (2003). A conspiracy is "an agreement to accomplish a criminal or unlawful act." State v. Pike, 978 S.W.2d 904, 915 (Tenn. 1998). The agreement "need not be formal or expressed, and it may be proven by circumstantial evidence." Id. However, "[n]o person may be convicted of conspiracy to commit an offense unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by the person or by another with whom the person conspired." Tenn. Code Ann. § 39-12-103(d) (2003).

In this case, the conspiracy involved the defendants' possession with intent to sell more than seventy pounds of marijuana within one thousand feet of a school. See Tenn. Code Ann. § 39-17-417(a)(4), (i)(13) (Supp. 2000); Tenn. Code Ann. § 39-17-432(b) (2003). In particular, Tennessee Code Annotated section 39-17-432(b) provides as follows:

> A violation of § 39-17-417, or a conspiracy to violate such section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000')

of the real property that comprises a public or private elementary school, middle school or secondary school shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(i) for such violation.

Tenn. Code Ann. § 39-17-432(b) (2003). This section is part of the Drug-Free School Zone Act, which is intended to "provid[e] all students in this state an environment in which they can learn without the distractions and dangers that are incident to the occurrence of [illegal] drug activity in or around school facilities." Tenn. Code Ann. § 39-17-432(a) (2003); see also State v. Fields, 40 S.W.3d 435, 439 (Tenn. 2001).

Although we will carefully consider all of the proof in the context of the new information offered at the coram nobis proceeding, it is our assessment that the evidence viewed in a light most favorable to the prosecution is sufficient to support the convictions of each defendant for conspiracy to possess marijuana with the intent to sell. The informant, Rodriguez, telephoned Romero, who agreed to sell the marijuana at the carwash on Nolensville Road. Romero and Hernandez traveled in a white Camry to a Walgreens location. A white Taurus occupied by Vasques and Alonzo followed the Camry, as did Vasquez and Garza, who were in a black Firebird. Romero, accompanied by Hernandez, drove to the carwash to deliver the marijuana as previously arranged. The Taurus, occupied by Vasques and Alonzo, was driven to that location. The Firebird, occupied by Vasquez and Garza, was driven to a Burger King parking lot within view of the carwash. When the police officers approached the scene, Vasques and Romero tried to flee but were apprehended. Hernandez, in the Camry, and Alonzo, in the Taurus, were arrested at the carwash. Bags containing over seventy pounds of marijuana were found in the trunk of the Taurus. Another bag of the illegal drug was found nearby. The total weight of almost one hundred pounds in the cars was nearly identical to that bargained for by the informant. Loaded handguns and a walkie-talkie were found in the Camry at the carwash.

Vasquez and Garza were apprehended in the Burger King parking lot within view of the carwash. A shotgun was found in the Firebird. As a more detailed analysis of the facts will establish, there was adequate proof of a conspiracy among all of the defendants. There were numerous overt acts in furtherance of the conspiracy to transport illegal drugs on the part of each of the defendants. For example, all met at the Walgreens beforehand and each either participated in the delivery of marijuana to the carwash or placed himself in position to assist in the drug transaction.

Further, the evidence is sufficient to establish that the conspiracy to possess marijuana with intent to sell occurred within one thousand feet of a school. The officers conducted surveillance of both the carwash and the two residences on Antioch Pike. Some of the officers followed the Taurus and the Firebird from the residences on Antioch Pike to the carwash where the drug sale was to take place. One officer testified that the route was well within one thousand feet of several schools. The Taurus, the Camry, and the Firebird were seen together at Walgreens just before the arrests. The Walgreens was eighty-one feet from Radnor Baptist Elementary School and that school was "just shy" of one thousand feet from the carwash. We must, therefore, conclude that the evidence was

sufficient for a rational trier of fact to have found that the defendants conspired to possess with the intent to sell nearly one hundred pounds of marijuana within one thousand feet of a school zone.

In reaching this conclusion, we reject Alonzo's argument that simply traveling through a school zone is not enough to apply the provisions of the Drug-Free School Zone Act. We also decline to accredit Vasques' argument that the Act should not apply because a conspiracy, which may extend over a significant period of time, bears no reasonable relation to the prohibition of illegal drugs in a school zone. Tennessee Code Annotated section 39-17-432(b) plainly applies to a conspiracy "occurring either on the grounds or facilities of any school <u>or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school or secondary school</u>." Tenn. Code Ann. § 39-17-432(b) (2003) (emphasis added).

## JURY INSTRUCTIONS

The defendant Hernandez submits that at the conclusion of all the proof, the trial court erroneously failed to provide instructions on lesser-included offenses. He contends that the statutory waiver of this ground by virtue of his failure to request a supplemental instruction, as required by Tennessee Code Annotated section 40-18-110, violates his constitutional right to a jury trial.

Some procedural background is necessary to place the issue into context. As the Court of Criminal Appeals observed, none of the defendants asked the trial court to provide a jury instruction on the offense of facilitation of a conspiracy to possess with the intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone. Moreover, only Romero argued to the Court of Criminal Appeals that the omission was erroneous. The intermediate appellate court, opting to review the record for possible plain error as to all of the defendants, ruled that the trial court erred by failing to charge the jury on facilitation but concluded that the error was harmless beyond a reasonable doubt in light of the "overwhelming" evidence of a conspiracy. In the appeal to this Court, only Hernandez has presented the issue.

Tennessee Code Annotated section 40-18-110(c) provides that a defendant waives any error on the instructions by failing to make a special request for a jury charge on a lesser-included offense. Tenn. Code Ann. § 40-18-110(c) (2003). The statute states that "[a]bsent a written request, the failure of a trial judge to instruct the jury on any lesser included offense may not be presented as a ground for relief either in a motion for a new trial or on appeal." <u>Id.</u>

Recently, this Court ruled that "the waiver of a lesser-included offense for purposes of plenary appellate review is constitutionally permissible." <u>State v. Page</u>, 184 S.W.3d 223, 230 (Tenn. 2006). In that decision, this Court observed that "[a]s a non-structural constitutional error, the omission of a lesser-included offense instruction is subject to waiver for purposes of plenary appellate review when the issue is not timely raised and properly preserved." <u>Id.</u> The review is limited to the standard governing plain error. <u>Id.</u> at 230-31. First, it is our view that waiver under Tennessee Code Annotated section 40-18-110 does not violate the right to a jury trial or separation of powers principles under the Tennessee Constitution. <u>Page</u>, 184 S.W.3d at 231; <u>see also</u> Tenn.

Const. art. I, § 6; art. II, § 2.  The holding in <u>Page</u> controls.  Moreover, the Court of Criminal Appeals correctly determined that the omission did not qualify as plain error.  <u>See</u> <u>State v. Adkisson</u>, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

## WRIT OF ERROR CORAM NOBIS

We begin this analysis by first addressing whether the Court of Criminal Appeals correctly affirmed the grant of coram nobis relief to Vasquez and Garza while at the same time reversing the grant of coram nobis relief to Vasques, Hernandez, and Alonzo.  The State argues that coram nobis relief was inappropriate as to any of the defendants because the evidence was sufficient to support the convictions without Agent Howell's testimony.  The State argues that none of the defendants established that the outcome of the trial "would have" been different had the new evidence been presented to the jury.  Vasques, Hernandez, and Alonzo, on the other hand, argue that they, like Vasquez and Garza, were entitled to coram nobis relief because the outcome of the trial "may have" been different had the evidence been presented to the jury.

The writ of error coram nobis originated in the English common law and although the remedy was primarily applied in civil litigation, it was available in both civil and criminal proceedings.  <u>See</u> <u>State v. Mixon</u>, 983 S.W.2d 661, 666-67 (Tenn. 1999) (citing Morgan Prickett, <u>Writ of Error Coram Nobis in California</u>, 30 Santa Clara L. Rev. 1, 6-9 (1990)).  Under the common law of this state, however, the writ of error coram nobis was available only in civil proceedings.  <u>Id.</u> at 667-68 (citing <u>Green v. State</u>, 216 S.W.2d 305 (Tenn. 1948)).  In tracing the common law origins of the writ, this Court has made the following observations:

> The writ of error coram nobis is an extraordinary remedy known more for its denial than its approval.  The writ was developed by the judiciary in England during the Sixteenth Century.  Since neither the right to move for a new trial nor the right to appeal were recognized at common law, the writ of error coram nobis was developed as a procedural mechanism to allow courts to provide relief under limited circumstances.  Essentially, the common law writ of error coram nobis allowed a trial court to reopen and correct its judgment upon discovery of a substantial factual error not appearing in the record which, if known at the time of judgment, would have prevented the judgment from being pronounced.

<u>Mixon</u>, 983 S.W.2d at 666-67 (citations and footnote omitted).

In 1858, the General Assembly enacted a statutory version of writ of error coram nobis which was confined to civil cases and was limited in scope to "the correction of a material error of fact, where the applicant has had no notice of the proceedings, or was prevented from making defense by surprise, accident, mistake or fraud, without fault on his part."  <u>Dinsmore v. Boyd</u>, 74 Tenn. 689, 696 (1881).  It was not until 1955 that the General Assembly made coram nobis relief available in criminal cases and mandated that such proceedings be "governed by the same rules applicable to [the writ of error coram nobis] in civil cases, except in so far as inconsistent with the section."  <u>State ex</u>

-10-

rel. Carlson v. State, 407 S.W.2d 165, 167 (Tenn. 1966); see also 1955 Tenn. Pub. Acts ch. 166, § 1.  In 1978, the legislature amended the statute and the current version provides as follows:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Tenn. Code Ann. § 40-26-105(b) (2006) (emphasis added); see also 1978 Tenn. Pub. Acts ch. 738, § 1.  In criminal cases, the statute of limitations for a petition seeking a writ of error coram nobis is one year.[3]  Tenn. Code Ann. §§ 40-26-105(a) (2006); 27-7-103 (2000); see also Mixon, 983 S.W.2d at 668.

Despite the terminology used in the 1978 amendment, Tennessee courts have struggled with the proper standard to be applied in the determination of whether and when coram nobis relief is appropriate in a criminal case.  In the application of coram nobis principles under the 1955 standard, courts often considered whether the new evidence "would have resulted in a different judgment." State ex rel. Carlson, 407 S.W.2d at 167.  Our courts occasionally applied the "would have" standard even after the 1978 enactment of the "may have resulted in a different judgment" language found in Tennessee Code Annotated section 40-26-105(b).  See, e.g., State v. Hart, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

In contrast, this Court has more recently applied the "may have" standard.  Mixon, 983 S.W.2d at 673.  In Mixon, the victim recanted her testimony after the trial and before the appeal by the defendant.  The information came too late for inclusion in the motion for new trial.  In the appeal following the coram nobis proceeding, this Court characterized the "may have" language as requiring a trial court to grant a new trial based on newly discovered evidence if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

---

[3] A motion for new trial based upon newly discovered evidence must be filed within thirty days of the order of sentence.  See Tenn. R. Crim. P. 33(b).  The standard is comparable but slightly different from that in a coram nobis petition.  While trial courts are afforded discretionary authority, the grant of relief on a motion for new trial is warranted when the defendant has demonstrated reasonable diligence to uncover the evidence in advance of the trial and when the materiality is evident and likely to change the result if accepted by the jury.  State v. Goswick, 656 S.W.2d 355, 358-59 (Tenn. 1983); Taylor v. State, 171 S.W.2d 403, 405 (Tenn. 1943).

Id. at 673 n.17. Similarly, in Workman v. State, 41 S.W.3d 100 (Tenn. 2001), this Court remanded the case to the trial court for a coram nobis proceeding at which Workman, while attacking a sentence of death, was permitted to try "to establish that newly discovered evidence may have resulted in a different judgment if the evidence had been admitted at the previous trial." Id. at 104 (emphasis added). While making specific reference to the terminology of Tennessee Code Annotated section 40-26-105, this Court fully approved of the standard applied in Mixon. Id. Later, after the trial court rejected Workman's bid for a new trial, he again appealed. In its consideration of the statutory language in Tennessee Code Annotated section 40-26-105 and the test applied in Mixon, the Court of Criminal Appeals carefully examined the "may have" standard in a further effort to ascertain its practical application. State v. Workman, 111 S.W.3d 10, 17-18 (Tenn. Crim. App. 2002). Our intermediate appellate court affirmed the denial of relief, finding that the new evidence did not establish a "reasonable probability of a different judgment." Id. at 20. It concluded that a new trial was warranted only when there was "a probability sufficient to undermine confidence in the outcome." Id. at 18. The court compared the standard to that used in cases where the prosecution fails to disclose exculpatory evidence to the defense, see United States v. Bagley, 473 U.S. 667, 682 (1985), and where the defendant alleges prejudice as the result of the deficient performance of counsel, see Strickland v. Washington, 466 U.S. 668, 694 (1984). In its Workman decision, the Court of Criminal Appeals also observed as follows:

> It is arguable that the "may have resulted in a different judgment" language should be viewed under the same standard as a motion for new trial based upon newly discovered evidence. The test in such a situation is whether the newly discovered evidence "will likely change the result of the trial." However, this appears on its face to be a higher standard than the "may have" language in the statute and the "might have" language used by our supreme court in Mixon. Furthermore, a lesser standard would appear to be more appropriate . . . .

Workman, 111 S.W.3d at 18 (citation omitted).

Given this background of statutory and common law, it is not surprising that the trial and intermediate appellate courts in this case struggled with the intricacies of the "may have" standard and the steps involved in its application. In granting the petitions for coram nobis relief, the trial court utilized the "plain meaning" of Tennessee Code Annotated section 40-26-105 to determine that the new information about TBI Agent Howell "may have" resulted in different judgments:

> After considering the arguments and authority cited by all of the parties, the Court is persuaded by the Petitioners' argument. The Court points out that the plain text of the coram nobis statute clearly indicates that a writ will lie for newly discovered evidence if the judge determines that the evidence "may" have resulted in a different judgment. . . . Based on this unambiguous language, the Court is of the opinion that the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome, and that under the facts and circumstances of this case, the Petitioners' contention is well taken.

Citing Mixon, the Court of Criminal Appeals considered whether Agent Howell's improprieties qualified as "a reasonable basis . . . for concluding that the result 'might have' been different." After reviewing the relative evidence as to each defendant, the intermediate court concluded that there was a "reasonable probability" of a different result only for Vasquez and Garza.

In our effort to reconcile the conflicting interpretations, we first reject the position offered by the State. The "would have" standard, as suggested, is a restatement of the common law governing civil cases and is the test that was established by the 1955 statute which extended the remedy to criminal cases. The 1978 amendment, however, changed that. Tenn. Code Ann. § 40-26-105 (1982). Moreover, in recent cases, this Court has consistently followed the plain language of the legislation, upholding the "may have" or "might have" language. See Mixon, 983 S.W.2d at 666-68; see also Workman, 41 S.W.3d at 104. It is our view that the rigid interpretation favored by the State sets the bar so high that the authority of the trial courts, where the witnesses are observed firsthand, would be unduly limited in the exercise of the discretion so critical to the administration of justice.

Each of the defendants argues that new evidence which "may have resulted in a different result" is the proper standard. Although their arguments are based upon the plain language of Tennessee Code Annotated section 40-26-105(b), the "may have" standard, if interpreted literally, is too lenient in the common law context of writ of error coram nobis. To illustrate, Black's Law Dictionary defines "may" as "[a]n auxiliary verb qualifying the meaning of another verb by expressing . . . possibility, probability or contingency." Black's Law Dictionary 676 (6th ed. 1991). If based upon mere "possibility," coram nobis relief would be available to any defendant who, within one year of his conviction and sentence, discovers new evidence even if only slightly favorable to his defense. Although the legislature is presumed to have known the potential consequence when it adopted the "may have" language in the 1978 amendment, see Wilson v. Johnson County, 879 S.W.2d 807, 810-11 (Tenn. 1994), this Court should provide a definition which fits within the historically limited nature of coram nobis relief.[4]

In an effort to amplify the standard established in Mixon and confirmed by our own decision in Workman, we hold that in a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result. In the Court of Criminal Appeals opinion in this case, Judge Joseph M. Tipton described the analysis as follows: "whether a reasonable basis exists for concluding that had the

---

[4] In State v. Williams, 690 S.W.2d 517, 527-30 (Tenn. 1985), this Court was similarly faced with defining an otherwise undefined statutory term. In that case, this Court was called upon to supply a constitutional definition to the terms "heinous, atrocious, or cruel" as those terms relate to the imposition of the death penalty. This is precedent for this Court, in its effort to ascertain legislative intent, to either supply or further develop the definition of a statutory term. Id. at 529.

evidence been presented at trial, the result of the proceedings might have been different." Although imprecise, our standard, which requires determination of both the relevance and the credibility of the discovered information, offers a balance between the position of the State and that of the defense. In our view, this interpretation upholds the traditional, discretionary authority of our trial judges to consider the new evidence in the context of the trial, to assess its veracity and its impact upon the testimony of the other witnesses, and to determine the potential effect, if any, on the outcome.

Although not specifically addressed by the parties, it is our further view that whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling. Cf. State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984); State v. Arnold, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Impeachment evidence might be particularly compelling under the circumstances of a particular case. Moreover, a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts. Finally, the language of Tennessee Code Annotated section 40-26-105 makes no distinction between impeachment evidence and all other evidence. Thus, the ultimate question is the effect of the newly discovered evidence on the outcome when viewed under the standards in Mixon, our decision in Workman, and our analysis in this case.

In applying this standard to the evidence in this case, it is our conclusion that the Court of Criminal Appeals correctly affirmed the coram nobis relief granted to Vasquez and Garza. Although Agent Howell, who led the TBI in the investigation, was not involved in the arrest of any of the defendants, his testimony directly implicated Vasquez and Garza in the conspiracy. For example, it was Agent Howell who claimed that while parked in a nearby Burger King lot, the occupants of the Firebird, Vasquez and Garza, "constantly" looked straight ahead in the direction of the carwash and, during the course of the transaction, neither entered the restaurant nor left the car. Although other officers saw the Firebird at the Walgreens and at the Antioch Pike addresses, Vasquez and Garza were not identified as occupants of the vehicle at these locations, were not apprehended at the carwash where the drug transaction occurred, and were never found in the possession of the marijuana or any other illegal drugs. A shotgun was in their car but they were not in possession of a walkie-talkie or other radio device which might have permitted direct contact with their co-conspirators. Neither attempted to flee when confronted by the arresting officers. In considering the relative strength of the testimony at trial and the newly discovered evidence offered at the coram nobis hearing, both the trial judge, who saw and heard the witnesses, and the Court of Criminal Appeals, after a careful review of the recorded testimony, granted new trials to these two defendants under the "may have" standard. We likewise hold that there was a reasonable basis upon which to conclude that knowledge by the jury of Agent Howell's theft of confiscated drugs and his illegal use of cocaine was credible, relevant evidence of the kind and quality that might have produced a different result as to Vasquez and Garza. Among all defendants, the State's case was least compelling as to these two individuals. The misconduct of the lead investigator for the TBI, had it been known at trial, may have affected the result.

It is our further view that the Court of Criminal Appeals properly denied the coram nobis relief to Vasques, Hernandez, and Alonzo. While the trial court granted new trials for all defendants,

Agent Howell was not involved in the arrest or identification of these three defendants. Moreover, other officers testified to the surveillance and arrest of the occupants of the Camry (Romero and Hernandez) and the Taurus (Vasques and Alonzo). Several of the police officers testified that the Camry was at the carwash. There was other evidence that the Taurus was at the Walgreens nearby. Several officers testified that Hernandez was in the Camry when the drug transaction occurred. Similarly, several officers watched as the Taurus was driven to the two residences on Antioch Pike, where ultimately evidence was later found, and to the Walgreens location. Vasques and Alonzo were in the Taurus when the drug transaction occurred in the carwash parking lot. Vasques attempted to flee. Several trash bags of marijuana were found in the Taurus. Another was found just outside of the vehicle. The combined weight approximated one hundred pounds. The bags of marijuana were identical to those found at 1147 Antioch Pike. In summary, there is not a reasonable basis to conclude, under these circumstances, that the evidence of Agent Howell's improprieties may have led to different results as to these defendants.

While the defense speculates that the jury might have questioned the integrity of the entire investigation and acquitted all of the defendants had the evidence been available at trial, Agent Howell was only one of approximately fifteen TBI agents and Metropolitan police officers involved in this operation. From our review of the evidence at trial, there is no reasonable basis to find that the jury would have rejected the testimony of all the officers as to these four defendants due to the criminal activity of Agent Howell. Similarly, there is no reasonable basis upon which to conclude that a jury, in view of the new evidence, might have acquitted Vasques, Hernandez, and Alonzo, all of whom were direct participants at the scene in a transaction involving such a large amount of marijuana. The mere possibility of a different result in their cases is not enough to warrant relief under writ of error coram nobis.

### CONCLUSION

After considering the evidence in the record and the applicable authority, we conclude that the Court of Criminal Appeals properly granted coram nobis relief to Vasquez and Garza based upon the newly discovered evidence and properly denied coram nobis relief to Vasques, Hernandez, and Alonzo. We further hold that the evidence is sufficient to support the defendants' convictions and that Tennessee Code Annotated section 40-18-110 is compliant with constitutional safeguards. Accordingly, the judgment of the Court of Criminal Appeals is affirmed.

It appearing that each of the defendants is indigent, the costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

-15-