IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 14, 2009

## BERNARDO LANE v. STATE OF TENNESSEE

Direct Appeal from the Criminal Court for Shelby County
Nos. 94-11344-49, P-24886      James M. Lammey, Jr., Judge

No. W2008-02504-CCA-R3-CO   -   Filed December 11, 2009

The petitioner, Bernardo Lane, appeals the denial of relief from his petition for writ of error coram nobis. He was convicted of first degree felony murder, first degree premeditated murder, and four counts of aggravated robbery. On appeal, he argues that he has received newly discovered evidence in the form of an affidavit signed by a codefendant, which purports to exonerate the petitioner from all wrongdoing. After careful review, we affirm the denial of error coram nobis relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Bernardo Lane.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and David Zak, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This court summarized the following facts on direct appeal:

The facts in this case reveal that on December 27, 1993, there was a home invasion at 6858 Birch Run Lane in Memphis, Tennessee, during which four individuals were robbed. The four victims were Billy Mosley, his wife Artis Mosley, their daughter Danyale Davis, and their son Kenneth Mosley. During the robbery, Kenneth Mosley was shot once in the back and killed. Police developed the following four suspects in the crimes: Defendant Hanna, Defendant Lane, Andre Hamilton, and Derrick Coleman.

. . . .

The facts presented at trial revealed that in December 1993, Billy Mosley lived with his wife Artis Mosley, his son Kenneth Mosley, and his stepdaughter Danyale Davis at 6858 Birch Run Lane in Memphis, Tennessee. On the evening of December 27, 1993, he and Ms. Mosley had gone to bed and Kenneth Mosley had gone out bowling and/or to a wrestling match. Kenneth returned home between 10:00 and 10:30 p.m. Shortly thereafter, Billy Mosley heard a loud "bump" and then he heard screaming in the house. Billy Mosley got out of bed, and as he opened his bedroom door, a man put a gun in his face and told him to get back in the bedroom. Kenneth Mosley also told his dad to return to his bedroom. During this time, Billy Mosley heard someone yelling to Kenneth Mosley, "Where's the money, where's the damn dope." Billy Mosley and his wife retreated to the bathroom off of their bedroom. They then heard a single gunshot and Mrs. Mosley ran out of the room. Billy Mosley heard someone yell at his wife to get down on the floor. Shortly thereafter, he heard someone say, "We've been in this house too long, let's get out of here." Billy Mosley emerged a short time later to find Kenneth Mosley lying on the floor face down, having been shot in the back. He also noticed that his front door had been broken down.

Billy Mosley discovered that his wallet and pager, which had been on the dresser in his bedroom, were missing. He testified that Kenneth Mosley looked as if he had been searched because his clothes were "open," and his pants pockets were turned inside out. Mosley was unable to find the jewelry which Kenneth Mosley normally wore. A gallon jug of coins that had been on the floor at the front door was also missing. Mr. Mosley testified that he had once overheard an argument between Kenneth Mosley and an individual called "Nardo." Although Billy Mosley was not very familiar with Nardo, he testified that Nardo had once come to the house and left a note for Kenneth. However, he could not remember the exact date of Nardo's visit. The note, which was admitted at trial, stated the following:

> Say ma[ ]n you need to call me soon as possible because I don't know what you pulling. [I] told you I was on my way and you said you was not going no w[h]ere. I'm not asking you no more. It's been a straight month and this is last time. Don't take this as a [threat]. You just need [to] stop playing. I'm not playing no more. [phone number]

On cross-examination, Billy Mosley stated that he only caught a glimpse of the man who put a gun in his face. That man had nothing covering his face. Mosley also testified that he was not harmed during the incident. He said that the gunshot came after the intruders had been in the house approximately five minutes.

Artis Mosley, Kenneth's mother, testified to much of the same events as her husband. She said that she heard her daughter say, "Please don't hurt me," and that she then ran out of the bathroom and bedroom to the living room. A man then put a gun in her face and instructed her to lie down on the floor. One of the intruders had a towel

covering his face. She observed her son lying on the floor. She saw another man with a gun ransacking an adjacent bedroom. The man with a towel over his face took Mrs. Mosley's rings from her fingers. Mrs. Mosley testified further that Nardo had called their house on several occasions. She said that the voice of the man with a towel over his face sounded like that of Nardo.

Danyale Davis, Kenneth's stepsister, testified that she had discovered she was pregnant earlier on the day of the home invasion. She stated that she was on the telephone in her bedroom when she heard the loud crash that night. She went to her bedroom door and as she reached it, the door was thrown open and she saw a man with a towel over his face holding a gun. The man took money from her purse and proceeded to move her about the house, instructing her to "find the dope money." Ms. Davis asked the man not to hurt her because she was pregnant, and the man replied, "well, find the dope money." They proceeded through the house looking for money, and as they did so, Ms. Davis saw Kenneth Mosley lying on the floor with a man standing over him holding a gun.

Following the shooting, Ms. Davis was shown two photo arrays by Sergeant Richardson. She identified Defendant Hanna in one of the arrays and Defendant Lane in the other one. She further identified both Defendants in court as the perpetrators. However, Ms. Davis was unable to say who actually shot Kenneth Mosley. Ms. Davis also identified Kenneth Mosley's address book at trial. That address book had a listing for Nardo and phone number next to his name. That number matched the telephone number on the note left with Billy Mosley for Kenneth Mosley.

Sergeant Richardson testified that he learned that the telephone number listed beside the name Nardo in Kenneth Mosley's address book and on the note left for Kenneth Mosley, belonged to a pager registered to Defendant Lane. While at Defendant Lane's home, the police called the number and observed a pager come vibrating out from under a chest of drawers. Defendant Lane admitted that the pager was his.

Sergeant Richardson also explained that he took statements from Defendant Hanna and Andre Hamilton. Hamilton indicated that it was Hanna and Lane who entered the Mosley home. He also indicated the purpose of going to the Mosley home was to get money. After waiting in the car for a time, Hamilton and Derrick Coleman approached the home. As they did so, they heard a gunshot. Hamilton then returned back to the vehicle. Defendant Hanna's statement indicated that Hanna was indeed inside the Mosley home. According to Defendant Hanna, he was in a back room when he heard a gunshot. Defendant Hanna admitted that they were all going to split the money, but stated that he did not find any money.

Sergeant Richardson also retrieved live .380 caliber Winchester ammunition from

Defendant Hanna's residence. During the course of an interview with Derrick Coleman, Sergeant Richardson learned that a .380 handgun was missing from the Coleman household. Coleman's mother gave Sergeant Richardson ammunition from the spare clip to the gun. Sergeant Richardson sent this ammunition to the Tennessee Bureau of Investigation for testing against the bullet recovered from Kenneth Mosley's body and the spent shell recovered from the Mosley home. Defendant Hanna admitted to having possessed a .380 handgun on the night of the shooting. Sergeant Richardson also testified that a towel matching the description of the one worn by one of the intruders was recovered from the vehicle driven by Andre Hamilton on the night of the shooting.

Robert Royse, a forensic scientist with the TBI, testified concerning firearms identification testing. Royse testified that the bullet recovered from Kenneth Mosley was a .380 auto bullet[] and that the spent shell casing recovered from the Mosley home was a .380 auto Winchester shell. Royse further testified that two live rounds of ammunition also went to him for testing and that they were .380 auto Winchester.

Dr. Jerry Francisco testified that Kenneth Mosley died from a single gunshot wound to the back which tore through his major organs and severed his aorta. Dr. Francisco stated that he found no drugs or alcohol in Kenneth Mosley's system. The distance of the gunshot was greater than two feet from Kenneth Mosley's body.

Defendant Hanna offered no proof at trial. Defendant Lane offered only the testimony of Paul Dalhauser, a genetic testing expert. Dalhauser testified that he attempted to perform DNA testing on the towel recovered from Andre Hamilton's vehicle. However, the towel did not contain enough DNA for analysis, so the test was inconclusive.

*State v. Redonna T. Hanna and Bernardo C. Lane*, No. 02C01-9806-CR-00165, 1999 Tenn. Crim. App. LEXIS 909, at **4, 7-13 (Tenn. Crim. App. at Jackson, Sept. 7, 1999).

In his petition for writ of error coram nobis, the petitioner alleged that he had received newly discovered evidence that was not available at the time of his trial. Specifically, he argues that his codefendant, Redonna Hanna, executed an affidavit on May 24, 2007, which stated that the petitioner was not responsible for the wrongdoing identified in the judgments. The petitioner did not attach an actual copy of the affidavit in his petition for relief but, rather, handwrote the language of the affidavit. According to the petitioner, codefendant Hanna stated in the alleged affidavit that he conspired with other codefendants to blame the petitioner for the murder.

The State responded to the petition and filed a motion to dismiss on July 29, 2008. The State raised the affirmative defense that the petition was untimely and argued that the testimony of codefendant Hanna was "neither the sole or primary reason that the petitioner was found guilty by the jury in the case."

The trial court denied the petition on October 22, 2008, finding that the petition was time-barred because the statute of limitations had passed. However, the court analyzed whether due process required a tolling of the statute. The court stated:

> Even assuming that the new statement is true, this court is not reasonably satisfied that the jury would have reached a different verdict had they been aware of the statement. The jury had much more evidence sufficient to support the convictions, such as Danyale Davis identifying [the] Petitioner, in a photo line-up and at trial, as one of the perpetrators.

Thus, the court concluded that the petitioner had failed to meet his burden of establishing that the newly discovered evidence, if presented, would have resulted in a different verdict.

Analysis

Trial courts may grant a criminal defendant a new trial following a judgment of conviction, under limited circumstances, through the extraordinary remedy offered by a writ of error coram nobis. T.C.A. § 40-26-105 (2006); *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999). The writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *Mixon*, 983 S.W.2d at 672. A writ of error coram nobis may be granted where the defendant establishes the existence of newly-discovered evidence relating to matters litigated at trial if the defendant shows he was without fault in failing to present the evidence at the proper time and if the judge determines the evidence may have resulted in a different judgment had it been presented to the jury. T.C.A. § 40-26-105; *Mixon*, 983 S.W.2d at 668. A petition for writ of error coram nobis must relate: (1) the grounds and the nature of the newly discovered evidence; (2) why the admissibility of the newly-discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial; (3) that the petitioner was without fault in failing to present the newly-discovered evidence at the appropriate time; and (4) the relief sought by the petitioner. *Freshwater v. State*, 160 S.W.3d 548, 553 (Tenn. Crim. App. 2004). The Tennessee Supreme Court has recently held that for a petition for a writ of error coram nobis to be successful, "the standard to be applied is whether the new evidence, if presented to the jury, may have resulted in a different outcome. . . ." *State v. Vasques*, 221 S.W.3d 514, 526 (Tenn. 2007).

It has been determined that, for purposes of coram nobis relief, a judgment becomes final thirty days after the entry of the judgment in the trial court, if no post-trial motion is filed or upon entry of an order disposing of a timely filed post-trial motion. *Freshwater*, 160 S.W.3d at 553. The one-year statute of limitations applicable to the writ of error coram nobis is an affirmative defense which must be specifically pled by the State, or it is deemed waived. *Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003); *Newsome v. State*, 995 S.W.2d 129, 133 (Tenn. Crim. App. 1998). The trial court, however, may consider an untimely petition if applying the statute of limitations would deny the petitioner due process. *Workman v. State*, 41 S.W.3d 100, 103 (Tenn. 2001); *Burford v. State*, 845 S.W.2d 204, 209-10 (Tenn. 1992).

To determine if due process requires tolling of the statute of limitations, a court must weigh the petitioner's interest in having an opportunity to present his claims in a meaningful time and manner against the State's interest in preventing the litigation of stale and fraudulent claims. *Burford*, 845 S.W.2d at 208. More specifically, a court should utilize the following analysis: (1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would have normally commenced; and (3) if the grounds are later-arising, determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim. *Sands v. State*, 903 S.W.2d 297, 301 (Tenn. 1995).

Here, the petitioner acknowledged that his petition was untimely but argues that due process should toll the statute of limitations. The petitioner specifically points to the opinion in *Workman*, in which the Tennessee Supreme Court permitted the petitioner to proceed with an untimely coram nobis petition. However, we conclude that, in the instant case, the trial court properly found that the petition was untimely and that due process did not require a tolling of the statute of limitations. The petitioner's judgment became final on June 4, 1998. The purported affidavit of the codefendant was allegedly executed on May 24, 2007. The petitioner did not file his petition for writ of coram nobis until May 22, 2008. The petitioner does not explain his almost one-year delay other than to state that it is comparable to other Tennessee cases where the statute of limitations was tolled.

In the present case, the one-year statute of limitations period expired in 1999, so we concur that the petition was clearly not timely. Thus, the claim for a writ of error coram nobis is barred unless the petitioner was not afforded a reasonable opportunity to present the claim before the limitations period ran. After careful review, we also agree that the trial court properly concluded that due process did not require a tolling of the statute of limitations because the petitioner failed to set forth a cognizable claim for coram nobis relief. The trial court found that the codefendant's statement to police was not the primary factor behind his convictions, and, therefore, the new alleged affidavit would not have been likely to prevent his convictions. According to the trial court, the jury that convicted the petitioner had "much more evidence sufficient to support the convictions, such as Danyale Davis identifying [the] Petitioner, in a photo line-up and at trial, as one of the perpetrators."

The petitioner also argues that the trial court erred when it failed to grant an evidentiary hearing. However, this court has previously held that coram nobis evidentiary hearings are not mandated by statute in every case. *State v. Johnny L. McGowan*, No. M2007-02681-CCA-R3-CO, 2008 Tenn. Crim. App. LEXIS 675, at *7 (Tenn. Crim. App. at Nashville, Aug. 5, 2008) (quoting *Richard Hale Austin v. State*, No. W2005-02591-CCA-R3-CO, 2006 Tenn. Crim. App. LEXIS 970, at **14-15 (Tenn. Crim. App. at Jackson, Dec. 13, 2006). A petition for coram nobis may be dismissed without a hearing and without the appointment of counsel for a hearing if the petition does not allege facts showing that the petitioner was entitled to relief. *Id.* (quoting *State ex rel. Edmondson v. Henderson*, 421 S.W.2d 635, 636 (Tenn. 1967)).

Conclusion

Based on the foregoing and the record as a whole, we conclude that the trial court did not abuse its discretion in denying the petition for writ of error coram nobis. The new evidence, in the form of an affidavit by a codefendant which purported to exonerate the petitioner, would not have been likely to result in a different outcome at trial if presented to the jury.

_____
JOHN EVERETT WILLIAMS, JUDGE