IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 11, 2017

**STATE OF TENNESSEE v. DERRICK RICHARDSON**

**Appeal from the Criminal Court for Hamilton County**
**No. 298242   Barry A. Steelman, Judge**

_____

**No. E2016-02293-CCA-R3-ECN**

_____

On December 10, 1992, Derrick Richardson, the Petitioner, was convicted of first degree felony murder and sentenced to life. On appeal, this court affirmed the Petitioner's conviction. *See State v. Derrick Richardson*, No. 03C01-9305-CR-00165, 1994 WL 247114, at *1 (Tenn. Crim. App. June 9, 1994), *perm. app. denied* (Tenn. Sept. 12, 1994) (concurring in results only). The Petitioner filed a petition for writ of error coram nobis based on the affidavits of three individuals who claimed that one of the State's "key witnesses," LaKeysh Davis, lied about seeing the Petitioner shoot the victim because she was inside her home and could not have seen the location where the shooting occurred. The Petitioner claims that the information provided by the affiants is newly discovered evidence. Following a hearing, the coram nobis court denied coram nobis relief. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, Derrick Richardson.

Herbert H. Slatery, III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; M. Neal Pinkston, District Attorney General; and Lance Pope, Assistant District Attorney, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This court on direct appeal summarized the facts as follows:

. . . In the early morning hours of December 8, 1993,[1] the [Petitioner], Gregory Strong, Stanley Gillespie, and Calvin Johnson were at or near the Heaton Street residence of LaKeysh Davis, the mother of Johnson's son. Apparently upset because Davis' husband had been shot only a short while earlier, all of the men were armed with guns. The victim, Louie Dwight, stopped his vehicle, approached the [Petitioner] and Strong as they stood on the side of the street, and asked to buy drugs. The [Petitioner], armed with a .38 pistol, and Strong, carrying a pump shotgun, fired several shots, took the victim's money, and threw his wallet on the ground.

Johnson testified that he and Gillespie heard the shooting and approached the scene. Johnson carried an AK47 assault rifle and Gillespie had a .380 pistol. Each fired shots. Either the [Petitioner] or Stanley Gillespie, or both, shot the victim in the legs. The victim got into his vehicle to leave, stopped, and returned to retrieve his wallet. He then drove away. After a short distance, however, the victim lost consciousness and wrecked. He died due to multiple gunshot wounds to his legs.

The Hamilton County Medical Examiner testified that the victim was struck by three bullets; there were two wounds in the right leg. A shot to the left leg pierced its main artery. All shots that struck the defendant were fired by low velocity weapons: a .38 or a .380.

Ms. Davis stated that the [Petitioner], Gillespie, and Strong participated in the robbery. She testified that the [Petitioner] held his weapon on the victim, took his wallet, and shot him in the leg. Strong testified that he and the [Petitioner] never had any kind of agreement to rob the victim and blamed the [Petitioner] for that offense. During the pretrial investigation, Strong stated that the [Petitioner] had shot at the victim's legs; at trial, he said he did not know who fired the shots that actually struck the victim.

---

[1] This date is incorrect. The record shows that the homicide occurred on December 8, 1991, and the Petitioner was convicted on December 10, 1992.

The [Petitioner], who told officers he fired his weapon twice, admitted having shot at the victim's truck but denied shooting the victim. While conceding that the victim handed him the wallet, the [Petitioner] testified that Strong took the money and was responsible for the robbery. At that point, he said, Johnson and Gillespie arrived. The [Petitioner] claimed Johnson shot at the victim's truck while Gillespie fired the fatal shots.

Id. at *1 (footnote added).

The Petitioner then filed a petition for post-conviction relief, claiming trial counsel was ineffective for, among other things, failing to interview four witnesses named in a statement given to police by co-defendant Calvin Johnson and for failing to call his brother, Tony Richardson, and his mother, Ernestine Richardson, as witnesses. On appeal from the post-conviction court's denial of relief, this court addressed this issue, as follows:

[The Petitioner] contends that Tony Richardson could have rebutted the testimony of La[K]eysh[][2] Davis, a crucial prosecution witness. At [the Petitioner's] trial, Ms. Davis testified that she observed from her front porch the events surrounding the robbery and subsequent murder of the victim. Tony Richardson was prepared to testify that, at the time of the murder, he was standing in the doorway of La[K]eysh[] Davis' apartment and that she was upstairs in her bedroom rather than on her front porch. However, Richardson also testified that he could not see the events surrounding the murder because his view was obstructed by a van which was parked between him[] and the location of the robbery and murder. [Trial counsel] explained that he opted not to call Tony Richardson because Richardson had not observed the murder. Moreover, [trial counsel] claimed that no one had informed him that Tony Richardson was prepared to refute [Ms.] Davis' statement that she witnessed the murder from her front porch. Finally, [trial counsel] emphatically stated that had Tony Richardson been able to clearly observe the robbery and the shooting of the victim, [trial counsel] definitely would have called Richardson as a witness.

At the post-conviction hearing, Ms. Richardson stated that had she been permitted to testify at her son's trial, she would have recounted a conversation between herself and [Ms.] Davis which occurred

---

[2] Throughout the post-conviction appeal opinion LaKeysh Davis is referred to as Lakeysha Davis. Ms. Davis spelled her name at the trial as LaKeysh, and we will refer to her by LaKeysh.

- 3 -

approximately three days before the commencement of the trial. According to Ms. Richardson, [Ms.] Davis told her, "M[]s. Richardson, wait a minute, I have something to tell you. I'm sorry, I didn't see nothing, I don't know nothing. Calvin told me to get up there and lie like that, said if I didn't, he would have no more use for me and my baby." At the post-conviction hearing, however, both [trial counsel] and Mrs. Richardson testified that Mrs. Richardson never disclosed this information to [trial counsel] at any time prior to [the Petitioner]'s trial.

With regard to the four witnesses mentioned above, [trial counsel] explained that he had not interviewed them because they could not be located and because he "had no leads about finding any of them." Under these circumstances, we find no deficient representation. Again, [the Petitioner] has also failed to show a reasonable probability that the result of his trial would have been different had these witnesses been called.

*Derrick Richardson v. State*, No. 03C01-9605-CR-00186, 1998 WL 18199, at \*3-4 (Tenn. Crim. App. Jan. 21, 1998) (footnote added), *perm. app. denied* (Tenn. June 8, 1998).

The Petitioner also filed a petition for writ of habeas corpus, which included as one of the grounds for relief that "the [S]tate relied upon perjured testimony to support the conviction[.]" *Derrick Richardson v. Virginia Lewis, Warden*, No. E2005-00817-CCA-R3-HC, 2006 WL 3479530, at \*1 (Tenn. Crim. App. Dec. 1, 2006), *no perm. app. filed*. The habeas corpus court summarily dismissed the petition. *Id.* On appeal, this court determined that the trial court correctly found that the claims were not cognizable "because, even if proven, they would render the judgment merely voidable and not void." *Id.* at \*2.

The Petitioner next filed two motions to reopen his post-conviction case, the first filed in 2009 and the second filed in 2014. *See Derrick Richardson v. State*, No. E2014-01554-CCA-R3-PC, 2015 WL 1305759, at \*3 (Tenn. Crim. App. Mar. 20, 2015), *no perm. app. filed*. The trial court discovered the unresolved 2009 motion after the Petitioner filed his 2014 motion to reopen. *Id.* The 2009 motion claimed, in part, that Ms. Davis was willing to recant her trial testimony and that her willingness to recant was "new, scientific evidence of [the Petitioner's] innocence." *Id.* The trial court treated the 2009 motion as a petition for writ of error coram nobis and ordered the Petitioner to submit an affidavit from Ms. Davis within 60 days. *Id.* The Petitioner failed to file a signed affidavit from Ms. Davis, and the court dismissed both motions. *Id.* This court dismissed the appeal because the Petitioner failed to file an application for permission to appeal the denial of the motion to reopen post-conviction proceedings. *Id.* at \*4.

- 4 -

## Petition for Writ of Error Coram Nobis

On April 11, 2016, the Petitioner filed a Petition for Writ of Error Coram Nobis claiming that he should be granted relief based on newly discovered evidence. In support of his petition, the Petitioner filed the affidavits of three purported witnesses who claimed that Ms. Davis could not have seen the Petitioner shoot the victim:

(1) Tony Richardson claimed that he was on the porch of Ms. Davis' apartment and saw the Petitioner, Gregory Strong, Calvin Johnson, and Stanley Gillespie go inside Ms. Davis' apartment. A few minutes later, Mr. Strong and the Petitioner exited and walked down the street. He stated a "maroon Cherokee pulled up," and the victim got out "and walked up on" the Petitioner. Mr. Richardson said that he overheard the Petitioner "say loudly from the side of the Cherokee, 'man I don't sell dope.'" He said, "That's when I heard a BOOM, [but] I couldn't see because they were on the other side of the Cherokee." Then Mr. Gillespie and Mr. Johnson "came from behind the apartment," and Mr. Richardson heard gun shots "but didn't see who shot what." He claimed Ms. Davis "was inside her apartment and ran upstairs with her baby and Tinika Bates when they heard the first shots.";

(2) Tinika Bates claimed that she was sitting on the couch with Ms. Davis who had "her newborn in her arms," when the Petitioner, Mr. Strong, Mr. Gillespie, and Mr. Johnson came in and told them that her brother, Larry Smith, had "just been shot [] at a club named Henrys." She stated that, about fifteen minutes later, the Petitioner and Mr. Strong "went outside where [Mr.] Richardson was on the porch." Ms. Bates stated that, "shortly after," they heard gun shots, and she and Ms. Davis "took the baby upstairs, while Mr. Johnson and Mr. Gillespie went out the back door." She said, "While [Ms. Davis] and myself [were] under the bed with the baby, we heard all kinds of gun shots go off[.]"; and

(3) Fred Conyers affirmed that he "was standing on the other side of the street and a few minutes later, a man in a maroon truck[-]like jeep pulled up[,] and the man got out of the truck and start[ed] walking up on [the Petitioner] asking to buy crack cocaine." He stated that the Petitioner "told the man that he [didn't] sell crack cocaine but the man kept walking up on [the Petitioner], and [the Petitioner] back[ed] up and pulled out a gun and told the man to back up off him and the man step[ped] to the right and [the Petitioner] shot the driver's side door and the driver's side back tire."

Mr. Conyers stated that a "few second later, Mr. Strong shot his gun in the air and told the man to leave[,] but the man handed [the Petitioner] his wallet and [the Petitioner] handed the wallet to [Mr. ]Strong, and [Mr. S]trong threw the wallet on the ground." He said that a "few minutes later [Mr.] Johnson and [Mr.] Gillespie came from behind the project complex and [Mr. Johnson] started to shoot the man['s] truck/jeep up and [Mr. Gillespie] started to shoot the man in the legs for no reason."

## Coram Nobis Hearing

The coram nobis court conducted a hearing over the course of three days. On July 25, 2016, seven witnesses, including affiants Fred Conyers and Tony Richardson, testified.[3] Mr. Conyers testified that he grew up in the same area as the Petitioner. He said that, on the day of the homicide, he was "just hanging out in the projects, about 3 a.m., so . . . the club just closed and everybody [was] just out chilling." He saw the victim drive up to where the Petitioner and Mr. Strong were standing and asked to buy drugs. He could see what was happening, but he could not hear their conversation. He said that the events occurred "kind of" near Ms. Davis' house and that, when the first shot was fired, he ran for cover. He did not remember seeing Ms. Davis. He stated that Stanley Gillespie and Calvin Johnson "were the ones doing all of the shooting[,]" and they "were basically the ones that actually shot [the victim]."

On cross-examination Mr. Conyers stated that he was in federal prison on drug charges when he learned by watching the news that the Petitioner had been convicted of felony murder. He initially stated that he was convicted of federal drug charges in May or June of 1991. He later stated that he was arrested in May or June of 1991 and remained continuously incarcerated in the county jail for seventeen months until his jury trial. After he was convicted, he remained in federal custody until 2000.

Tony Richardson, the Petitioner's older brother, testified that he was subpoenaed by the State for his brother's trial, but he was never called as a witness. He stated that he was standing on Ms. Davis' front porch when the victim's brick-colored Jeep pulled up; Ms. Davis was upstairs with her newborn child and Ms. Bates. He heard the Petitioner tell the driver of the Jeep, "I don't sell drugs." He stated that the Petitioner, Mr. Strong, and the driver of the Jeep moved around to the other side of the vehicle "where [he] couldn't see," and he heard a "pow." He said that "[a]fter Calvin [Johnson] and Stanley

---

[3] Thomas Eustice of the Hamilton County Sheriff's Department testified at the first hearing that he placed a subpoena for Ms. Davis and Ms. Bates in the United States mail. Ms. Davis and Ms. Bates did not appear at the hearing on July 25. The coram nobis court found that mail service of process was not sufficient and granted a continuance so that the Petitioner could attempt to personally serve Ms. Davis and Ms. Bates.

[Gillespie] came around from the back of the house and they went to the other side of the truck too, then [he] heard a lot of shots."

Ernestine Richardson, the Petitioner's mother, testified that in 2013, Ms. Davis told her that "she did not see anything.[4] She was [] under the bed with her two-month-old son." Ms. Richardson took the information to Detective Kilgore, and Ms. Richardson was later notified that a detective had spoken with Ms. Davis and that Ms. Davis maintained that her testimony was true. Ms. Richardson claimed that Ms. Davis had been forced to lie at trial by her baby's father, Calvin Johnson, and others. She said that Mr. Johnson was charged in the homicide, but he received probation. On cross-examination, Ms. Richardson stated that she did not remember testifying at the post-conviction hearing.

Curtis Mapp testified that he was a childhood friend of the Petitioner. He said the Petitioner contacted him from prison and asked him for help in finding witnesses who could state that Ms. Davis gave false testimony during the Petitioner's jury trial. He spoke to several people and prepared affidavits from what they told him. He said he carried the affiants to a notary where the affidavits were signed.

The Petitioner testified that he and a few of his friends were at a club called Henry's and that, after it closed, "[they] all went back to the projects" where Larry Davis, Ms. Davis' husband, was shot. The Petitioner and Mr. Strong went to Ms. Davis' house to tell her about the shooting; Mr. Johnson and Mr. Gillespie also came to the house. While the Petitioner and Mr. Strong were outside smoking a cigarette, the victim pulled up, got out of his Jeep, and asked to buy some crack. The Petitioner said that the victim "still was walking up on [him] so [he] shot the back tire[]" of the victim's Jeep because he felt scared. He said that Mr. Strong then "shot up in the air" and told the victim to "get up out of here." The Petitioner said that, after he shot the victim's back tire, the victim handed his wallet to the Petitioner, who handed it to Mr. Strong; Mr. Strong then threw the wallet on the ground, and Alonzo Richardson picked the wallet up. The Petitioner said that when "[Mr.] Gillespie and [Mr.] Johnson came around the corner from behind the house[,] . . . [Mr.] Johnson just started shooting the truck for no reason, and [Mr. Gillespie] shot him in the leg for no reason." The victim "drove down the street for a minute and stopped the truck and walked back down the street and said, man, where [is] my wallet at?" The Petitioner claimed that Mr. Freeman handed the wallet to the victim, who walked back to his vehicle and drove away.

---

[4] Ernestine Richardson was Ernestine Freeman at the time of the coram nobis hearing. We will continue to refer to her as Ms. Richardson to avoid confusion.

The Petitioner said that he contacted Ms. Bates's brother, Larry Smith, when Mr. Smith was released from federal prison, and Mr. Smith told him that Ms. Bates said that Ms. Davis was upstairs when the victim was shot and did not see anything.[5] The Petitioner noted that Mr. Strong, Mr. Gillespie, and Mr. Johnson all received sentences that were more lenient than his sentence for their involvement in the offenses.

Cameka Bruce testified that she worked in the major crimes division of the Chattanooga Police Department. She spoke with Ms. Davis on February 24, 2015, after Ms. Richardson reported that Ms. Davis had recanted her testimony. Officer Bruce could not discern any difference between what Ms. Davis told her and Ms. Davis' testimony. Her report was entered into evidence as Exhibit 4 without objection. The report stated:

> Ms. Richardson reported she came in contact with the witness, [Ms.] Davis, who testified during her son's trial a few years ago. Ms. Richardson reported Ms. Davis stated she lied on the stand during her trial. Ms. Richardson claims Ms. Davis stated she never witnessed any of the events she reported to Police and testified to during the trial.
>
> . . . .
>
> Inv. Puglise and I spoke with Ms. [Davis] on the front porch of her residence at the address listed above. Ms. [Davis] reported her statement to Police and testimony during the trial remains the same. Ms. [Davis] reported she has received threatening letters from [the Petitioner] while he has been in prison. Ms. [Davis] reported [the Petitioner] demanded she go to the District Attorney's office and change her statement or he would send people he knows (Gangster Disciples) after her. Ms. [Davis] stated she disposed of the letters after reading them. Ms. [Davis] reported she moved to her current residence in an attempt to get away from threats against her. Upon completion of the follow-up investigation, there's no new or additional information to be taken into consideration pertaining to this case.

Ms. Davis testified on August 18, 2016. She was first examined by the court about failing to appear on August 15, 2016.[6] She denied being served a subpoena, which the court found to be untrue. Her bond was set at $10,000, and she was removed temporarily from the courtroom. Before exiting, she stated that she did not remember testifying at trial. Ms. Davis was brought back into the courtroom and was sworn as a

---

[5] The record does not contain the date Mr. Smith was released from federal prison.

[6] On August 15, 2016, Steve Duncan testified that he served the subpoena on Ms. Davis and tried unsuccessfully to serve Ms. Bates with a subpoena on nine separate occasions. When Ms. Davis failed to appear on August 15, the coram nobis court issued a capias for Ms. Davis.

witness. When asked by the coram nobis court if she could make the $10,000 bond, Ms. Davis stated: "I can't. I don't care what y'all do to me. Y'all already endangered me and my family's life. They already tried to kill my son. I don't care. It doesn't matter to me." Ms. Davis refused to say who tried to kill her son or who had threatened her. The coram nobis court then explained that Ms. Davis was in custody because she failed to cooperate with the coram nobis court's orders. Ms. Davis was again removed from the courtroom. After extensive discussion with counsel and at the request of the Petitioner, the coram nobis court admitted the transcript of Ms. Davis' trial testimony as Exhibit 9.

Ms. Davis was brought back into court, and the Petitioner was recalled as a witness. He claimed that he was not criminally responsible for the murder because there was "no common design between two or more people" to rob the victim. Following the Petitioner's testimony, the coram nobis court announced that it would take the matter under advisement. However, after further discussion, Ms. Davis was recalled as a witness and the following exchange took place:

[THE STATE:] And where were you at when you first heard gunshots?

[MS. DAVIS:] I was standing in my front room, me and Mr. Johnson. [The Petitioner's] brother, Tony Richardson, was on my front porch. Me and Mr. Calvin Johnson w[ere] in my house. We heard arguing, then we heard gunshots. I let Mr. Calvin Johnson out of my house. He ran to see what was going on. Mr. Tony Richardson told me to lock my doors and grab my boys, because I had two of them, grab my boys and go hide.

So I grabbed my boys, went upstairs, put them in the bath tub, went in my bedroom, looked out the window, and every last one of them, [Tony] Richardson, Mr. Johnson, every last one of them shot that man. They robbed that man and they shot that man. Every last one of them shot that car up. Every last one of them. Every last one of them.

[THE STATE:] You saw this from - -

[MS. DAVIS:] I s[aw] it all. Every last one of them, [the Petitioner], Mr. Johnson, [Mr.] Gillespie, every last one of them . . . robbed that man and they shot that man and that man got back in his car and they started shooting at him. He had a green truck. Every last one of them did. And they all need to be in jail, every last one of them do [sic], because they didn't have [any] business bothering that man.

- 9 -

## Coram Nobis Court's Order

The coram nobis court issued a detailed order going through the case history and the testimony of the witnesses at the hearings. The coram nobis court found that "[a]t all relevant times, the [P]etitioner knew that his brother was on Ms. Davis' porch during the incident and was a potential witness." The coram nobis court ruled that Mr. Richardson's evidence was not newly discovered and faulted the Petitioner "for not presenting it before now." The coram nobis court also noted that "at all relevant times, the [P]etitioner knew or had reason to know from his own and his brother's observations that [Ms. Bates] was upstairs with Ms. Davis during the incident and was a potential witness." Concerning Mr. Conyers' evidence, the coram nobis court found that "neither party was aware that Mr. Conyers was in the alley during the incident until his conversation with Mr. Mapp early this year." The coram nobis court "regard[ed] this evidence as newly discovered, d[id] not fault the [P]etitioner for not presenting it before now, and f[ound] that due process preclude[d] strict application of the statute of limitations." However, the coram nobis court determined that there was no reasonable basis to conclude that Mr. Conyers' evidence, had it been presented at trial, would have led to a different result and dismissed the petition. The Petitioner timely appealed.

## Analysis

On appeal, the Petitioner claims that the coram nobis court erred in finding that the newly discovered evidence did not warrant a new trial because the coram nobis court based that finding on only a portion of the trial testimony. The State argues that the coram nobis court acted within its discretion in determining that there was no reasonable basis to conclude that the newly discovered evidence, had it been presented at trial, would have led to a different result. We agree with the State.

### *Error Coram Nobis Relief*

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will

- 10 -

lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Unlike the grounds for reopening a post-conviction petition, the grounds for seeking a petition for writ of error coram nobis are not limited to specific categories. *See Harris v. State*, 102 S.W.3d 587, 592 (Tenn. 2003). "Coram nobis claims may be based upon any 'newly discovered evidence relating to matters litigated at the trial' so long as the petitioner establishes that he or she was 'without fault' in failing to present the evidence at the proper time." *Id.* at 592-93. Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. *Id.* at 593.

> [I]n a coram nobis proceeding, the trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity. If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

*State v. Vasques,* 221 S.W.3d 514, 527 (emphasis in original). In determining whether the new information may have led to a different result, the question before the court is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the results of the proceedings might have been different." *Id.* (citing *State v. Roberto Vasques et al,* No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. Oct. 7, 2005)). The decision to grant or deny coram nobis relief rests within the sound discretion of the trial court. *Id.* at 527-28.

*Newly Discovered Evidence*

We agree with the coram nobis court's finding that "[a]t all relevant times,[7] the [P]etitioner knew that his brother [Tony Richardson] was on Ms. Davis's porch during the incident and was a potential witness." The coram nobis court correctly determined that Mr. Richardson's testimony was not newly discovered evidence. We also agree with the coram nobis court's finding that "at all relevant times, the [P]etitioner knew or had reason to know from his own and his brother's observations that [Ms. Bates] was upstairs

---

[7] The Petitioner should have known by the date of his jury trial that his brother was on Ms. Davis' porch and certainly knew by the time of his post-conviction relief hearing when his brother testified concerning his and Ms. Davis' location during the homicide.

with Ms. Davis during the incident and was a potential witness." The trial court correctly determined that the information in Ms. Bates's affidavit was not newly discovered evidence.

The coram nobis court found Mr. Conyers' testimony to be newly discovered evidence. Mr. Conyers initially testified at the coram nobis hearing that he was convicted of federal drug offenses in May or June of 1991. He later stated that he was arrested in May or June of 1991 and remained in custody for seventeen months until his trial, and that following his conviction, he remained incarcerated until his release from prison in 2000. Under either version of Mr. Conyers' testimony, he was incarcerated on December 8, 1991, when the homicide he claimed he witnessed was committed. Mr. Conyers could not have observed the homicide or the location of Ms. Davis during the homicide. Although Mr. Conyers' evidence may have been newly discovered by the Petitioner, its veracity is highly questionable.

*Effect of Newly Discovered Evidence on Verdict of Guilty*

Although the coram nobis court did not have before it the entire trial transcript, the coram nobis court did have access to the following evidence: the testimony of numerous witnesses at the coram nobis hearing; various exhibits; the opinions of this court from the direct appeal, the post-conviction relief appeal, the habeas corpus appeal, and the appeal from the motion to reopen post-conviction relief proceedings; and the transcript of Ms. Davis' testimony. The coram nobis court had more than sufficient evidence to make the necessary findings and to render its decision. The trial court summarized its reasoning for determining that there was no reasonable basis to conclude that Mr. Conyers' evidence had it been presented at trial would have led to a different result, as follows:

> [T]he [P]etitioner admitted firing first, firing two shots at the victim's vehicle before the arrival of shooting co-defendants, and the petitioner did not explain why the victim handed him the victim's wallet or why he apparently passed the wallet to co-defendant Strong instead of returning it to the victim. Thus, contrary to his assertions, his own trial testimony implicates him in robbery.

> Furthermore, none of the evidence in issue, newly discovered or not, including the [P]etitioner's, his brother's, or Mr. Conyers's testimony, satisfactorily explains the [P]etitioner's actions. Arguably, the brother's account of everyone's movement to the other side of the truck inculpates the [P]etitioner even more, contradicting the [P]etitioner's and Mr. Conyers's belated explanations that the [P]etitioner fired shots to discourage the victim's approach by suggesting that the [P]etitioner and co-

defendant Strong pursued the victim around the vehicle, back to the driver's door.

Nor does the newly discovered evidence concern the [P]etitioner's criminal responsibility for the conduct of the late-arriving actors. Thus, if the evidence of his criminal responsibility was sufficient, it remains so.

The coram nobis court did not abuse its discretion in determining that there was no reasonable basis to conclude that Mr. Conyers' evidence had it been presented at trial would have led to a different result.

## Conclusion

The judgment of the coram nobis court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 13 -