IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs July 25, 2017

## STATE OF TENNESSEE v. LAVELY L. BROWN

**Appeal from the Criminal Court for Knox County**
**No. 104135     Steven W. Sword, Judge**

_____

**No. E2016-02099-CCA-R3-ECN**

_____

The Petitioner, Lavely L. Brown, appeals the denial of his petition for writ of error coram nobis. Following our review, we affirm the judgment of the coram nobis court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Lavely L. Brown.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Charme P. Allen, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In January 1989, a Knox County Criminal Court jury convicted the Petitioner of the first degree murder, armed robbery, and aggravated kidnapping of the victim, Richard Mashburn. The trial court sentenced the Petitioner to life imprisonment for the murder conviction and two terms of forty years as a Range II offender for the armed robbery and aggravated kidnapping convictions, to be served concurrently to the life sentence. The convictions were affirmed by this court on direct appeal, and our supreme court denied the Petitioner's application for permission to appeal. State v. Lavely Brown, No. 1278, 1990 WL 112370, at *1 (Tenn. Crim. App. Aug. 8, 1990), perm. app. denied (Tenn. Dec. 10, 1990).

Our direct appeal opinion provides the following summary of the evidence presented at trial:

A review of the record reveals the following facts. The bound and nude body of [the victim] was found in his West Knoxville apartment on May 14, 1986. A pathologist, called by the State, testified that [the victim] had been killed several days prior to when the body was found.

. . . .

[The Petitioner's] accomplice, James Robinson, testified in detail as to how he and [the Petitioner] entered [the victim's] apartment with the intent to rob him. The men then tied [the victim] up and began searching for money. At that point, Robinson went into the bedroom to search it. He heard [the victim] beg for mercy and [the Petitioner] answer that God could not help him any more. Robinson further testified that he returned from the bedroom just in time to see [the Petitioner] stabbing the victim in the neck. The [Petitioner] testified he was in no wise involved with the murder.

. . . .

In the case *sub judice*, several witnesses testified that [the Petitioner] had admitted the murder to them. One, Michael Settles, testified that on May 8, 1986, the night of the murder, the [Petitioner] came to his house and said that he had "stabbed [the victim]." Another, Scott Barker, testified that around Thanksgiving of 1986, the [Petitioner] told him that he had killed a man at the Sans Souci Apartments in Knoxville earlier that year. The Sans Souci Apartments are where [the victim] lived. Other witnesses gave similarly corroborative evidence.

Id. at *1-2.

The Petitioner filed a petition for post-conviction relief on December 10, 1993, and an evidentiary hearing was held on September 26, 1996. See Lavely Brown v. State, No. E2004-00886-CCA-R3-PC, 2005 WL 1882453, at *2 (Tenn. Crim. App. Aug. 8, 2005), perm. app. denied (Tenn. Dec. 19, 2005). On May 25, 2001, the Petitioner filed an amended petition for post-conviction relief, followed by a second amended petition on June 17, 2003, in which he raised a number of claims, including ineffective assistance of counsel. Id. This court affirmed the post-conviction court's denial of the petition, and our supreme court denied the Petitioner's application for permission to appeal. Id. at *1.

On September 3, 2014, the Petitioner filed a pro se petition for writ of error coram nobis on the basis of newly discovered evidence of actual innocence. Specifically, he alleged that in January and February of 2014, a man named Benny Cooper informed him that one of the State's key witnesses, Michael Settles, confessed that he had killed the victim and that he "had assisted law enforcement and the prosecution in fabricating a case against [the Petitioner.]" The Petitioner alleged that Mr. Cooper told him that Mr. Settles had been a key informant for law enforcement during that time, which was the reason that law enforcement officers and the prosecution were motivated to help him pin the murder on the Petitioner. The Petitioner further alleged that Mr. Cooper also informed him that another essential State witness, Barbara Brown, was a prostitute who not only gave "sexual favors to law enforcement" but who was also paid, in "pills," by Mr. Settles "to help frame [the Petitioner] for the offenses." Finally, the Petitioner alleged that Mr. Cooper also informed him that Mr. Cooper had been coerced into helping frame the Petitioner by the threat that he would not be released from Juvenile Detention unless he gave a statement consistent with the story provided by Mr. Settles and the police, which was that he had seen a black Mustang with four occupants in it around the time of the victim's murder. In support of these allegations, the Petitioner attached both a letter and an affidavit from Mr. Cooper. The affidavit, dated January 29, 2014, reads in pertinent part:

> On May 10, 1986, I was admitted to the Juvenile Correctional Center in Knoxville[,] Tennessee. Affiant state[s], that on May 19, 1986, without my parents or an attorney present, I was pressured by Marie Myers[,] the probation counselor at the time, at the Juvenile Court to give a taped recorded statement concerning the said murder of [the victim]. I did not want to give a statement. However, a detective by the name of Terry Henry who was in control of the interview stated that I was ordered by Judge Cary E. Garrett, Juvenile Judge of Knoxville, Knox County to do so, and if I didn't talk I would not be let out of detention. The pressure was constantly put on me by two detectives and the probation counselor. Before giving the statement, I was coached on what to say by the two detective[s,] Terry Henry and Gary Moyers. The things that the detectives wanted me to say sounded alot [sic] like what Michael "Mousey" Settles told me he wanted me to say a few days prior to being picked up, that if I was ever questioned by police. During the interview I was very scared. I couldn't think straight and I was willing to say anything. In my statement I stated I saw a black [M]ustang with four people in it. That was not the truth. That is what "Mousey" wanted me to say, if I was ever questioned. It is also what the detectives told me to say also. I never saw any car come up. Mousey also made up a story about a bank card. Mousey told me it was important that I

-3-

stick with the story or he was going down for murder. I told Mousey that I didn't want to be caught in a lie. Mousey said not to worry about it because the police liked him for helping them on other crimes. He also said that it would not be the first time that he pinned something on somebody else. Mousey also told me to never mention the fact that he had blood on his clothes. A few years later, I heard that there was going to be a trial and that Mousey was going to testify. I contacted the police to tell that Mousey was lying. I was told on the phone that it wasn't my concern. I do not know who I spoke with. I then tried to contact the attorney for [the Petitioner] but I was unsuccessful. I then gave up until now, because all these years it has bothered me that Mousey told me to lie for him and the police knew it which resulted in an innocent man going to prison.

The coram nobis court appointed counsel to represent the Petitioner, and a hearing was held on June 24, 2016. The Petitioner testified that sometime in 2014, he overheard a conversation between two fellow inmates, Brandon Boling and "Jimbo," about how Michael, or "Mousy,"[1] Settles, had "'lied' to get them in the penitentiary." He said he later asked Jimbo if they had been talking about the same Mousy Settles who lived in Western Heights in Knoxville. When Jimbo answered in the affirmative, the Petitioner told him that Mr. Settles had lied to get him in the penitentiary as well. At that point, Jimbo asked, "Are you Brown?" The Petitioner replied that he was, and Jimbo told him that he needed to talk to Brandon Boling, because Mr. Boling's cousin had been searching for the Petitioner.

The Petitioner testified that when he spoke with Mr. Boling, Mr. Boling informed him that his cousin, Benny Joe Cooper, had been searching for the Petitioner for years because he knew who had murdered the victim. The Petitioner said he made contact with Mr. Cooper, and Mr. Cooper subsequently sent him a letter detailing what he knew. In response, the Petitioner obtained a sworn affidavit from Mr. Cooper, which he attached, along with Mr. Cooper's letter, to his petition for writ of error coram nobis.

The Petitioner testified that Michael Settles was not only one of the main witnesses against him at his trial but also "one of the main suspects." He said that Mr. Settles and the victim had been lovers and that Mr. Settles went to the victim's home "from time to time to get money." The Petitioner stated that he had learned from a fellow inmate at Brushy Mountain State Penitentiary that Mr. Settles had since died.

---

[1] We note that Mr. Settles' nickname is spelled as "Mousy" in the petition for error coram nobis relief and in the transcript of the error coram nobis hearing, but as "Mousey" in the affidavit of Benny Cooper, attached to the petition.

-4-

The Petitioner testified that he had no previous knowledge of Mr. Cooper or the information he provided about Michael Settles. However, on cross-examination, he acknowledged that Mr. Cooper had been interviewed by the police and that his name had been on the witness list for his trial, although he had not been aware of it at the time. He explained that the name had not "registered" with him because he never received a copy of Mr. Cooper's statement, Mr. Cooper did not testify at his trial, and none of his attorneys ever mentioned him.

The Petitioner acknowledged that both Mr. Settles and Scott Barker testified that the Petitioner confessed the killing to them. He further acknowledged that a third man, William Wright, had given a recorded statement, which was played at his trial, in which he also said that the Petitioner confessed the murder to him. The Petitioner remembered that Billy Graves had testified against him but claimed not to recall his having testified that, on the day of the murder, the Petitioner and another man ran up to his car to ask for a ride and that the Petitioner stopped at a store to wash his hands. The Petitioner said he could not recall Robin Woodside testifying at all, much less her having related the same story about how he had stopped at a store to wash his hands. When asked if he recalled Mr. Settles' girlfriend, Robin Moore, having testified that she overheard part of the Petitioner's conversation about how he had stabbed someone, the Petitioner denied that Ms. Moore ever testified at his trial. He acknowledged that Barbara Brown testified at his trial but denied that she said he admitted robbing the victim.

Benny Cooper, who said that his "mind [was] shot" and that he had great difficulty remembering things from so long ago, testified that he was currently in prison but at the time of the victim's murder lived next door to Michael Settles in Western Heights in Knoxville. He said he used to take Mr. Settles to see the victim, and Mr. Settles would "get money from the gay [victim]." Afterwards, he and Mr. Settles would use the money to "get high."

Mr. Cooper testified that Mr. Settles told him that if he were questioned by the police about the victim's murder, he should say that he saw "three black guys in a Mustang" visiting the victim. He said he was, in fact, questioned by two police detectives who came to see him while he was in juvenile detention. He stated that the police told him that his was the last vehicle that had been seen at the victim's residence and that both they and his probation officer urged him to cooperate, with the implied threat that he would be charged with the victim's murder if he did not. According to his vague testimony, the police detectives wanted him to tell the same story that Mr. Settles had given him about the "three black guys in a Mustang" having visited the victim. He claimed that the detectives told him they would help get him out of juvenile detention if he told that false story.

-5-

Mr. Cooper identified the letter he had sent to the Petitioner, as well as his signed affidavit, which, he said, a friend had helped him prepare because he did not read or write well. He initially testified that he was the one who first contacted the Petitioner because he believed the Petitioner was innocent of the crimes. However, when shown his letter to the Petitioner, in which he stated that he had received the Petitioner's letter, he acknowledged that he was confused and that the Petitioner must have contacted him first. He testified that the information he had provided in the affidavit was true. However, he also testified that Mr. Settles never told him anything about his role in the murder.

Mr. Cooper further testified that he was subpoenaed to testify at the Petitioner's trial, but he refused to do so because he "wasn't going to get on the stand and tell no lie." He said his grandmother called someone at the courthouse at some point, either before or after the trial, to tell about the detectives' having attempted to get him to lie at the Petitioner's trial. He did not know the identity of the person with whom his grandmother spoke.

On cross-examination, Mr. Cooper acknowledged he had been convicted of five counts of aggravated robbery in 1991, in addition to possession of a sawed-off shotgun and possession of a controlled substance in a penal facility. He further acknowledged that he had been convicted of two additional aggravated robberies in 2004 and was in prison for those offenses at the time the Petitioner contacted him. He testified that he had always hoped over the years that he would someday run into the Petitioner but that he never actively sought him out. He appeared unfamiliar with some of the details in his affidavit and, when pressed, repeated several times that it had all happened so long ago that he could not remember. Finally, he repeated that he had not testified at the Petitioner's trial and said that he would not have "testified, period."

The State's sole witness, retired Knoxville Police Department Detective Terry Henry, testified that he took statements from a number of witnesses, including Benny Cooper. He adamantly denied that he told Mr. Cooper what to say or asked Mr. Cooper's probation officer to influence his statement.

On September 12, 2016, the coram nobis court entered a detailed written order denying the petition. Among other things, the court found that Mr. Cooper's testimony was not credible, noting the numerous instances during the hearing in which Mr. Cooper appeared to have a "faulty memory" and the multiple conflicting answers he gave within a short period of time. The court found it troubling that Mr. Cooper was allegedly able to remember events from 1989 when preparing his 2014 affidavit, but was unable to recall those same details two years later at the hearing. The court also noted that Mr. Cooper never testified that Mr. Settles admitted to having committed the murder himself and that Mr. Cooper's testimony, that Mr. Settles convinced him to concoct a false story about

-6-

seeing three other individuals, would, at best, have served merely to challenge the credibility of Mr. Settles. Finally, the court observed that Mr. Cooper was a known witness at the time of trial and that there was no proof that he would have said that Mr. Settles committed the murder had he testified at trial. Accordingly, the court concluded that the alleged newly discovered evidence, even if deemed credible, would not have made a difference in the outcome of the Petitioner's trial.

## ANALYSIS

A writ of error coram nobis is an extraordinary remedy by which the court may provide relief from a judgment under only narrow and limited circumstances. State v. Mixon, 983 S.W.2d 661, 666 (Tenn. 1999). Tennessee Code Annotated section 40-26-105 provides this remedy to criminal defendants:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial. The issue shall be tried by the court without the intervention of a jury, and if the decision be in favor of the petitioner, the judgment complained of shall be set aside and the defendant shall be granted a new trial in that cause.

Tenn. Code Ann. § 40-26-105(b), (c) (2012).

Our supreme court has stated the standard of review as "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).

Coram nobis claims may be based upon any "newly discovered evidence relating to matters litigated at the trial" so long as the petitioner establishes that he or she was "without fault" in failing to present the evidence at the proper time. Harris v. State, 102 S.W.3d 587, 592 (Tenn. 2003). Coram nobis claims are "singularly fact-intensive," are not easily resolved on the face of the petition, and often require a hearing. Id. at 592-93. The decision to grant or deny coram nobis relief rests within the sound discretion of the coram nobis court. Vasques, 221 S.W.3d at 527-28.

The Petitioner argues that "the trial court committed legal error by dismissing the [p]etition for writ of error coram nobis on the grounds that 'there is no proof that [Benny

Joe Cooper] would have said that Mr. Settles committed the offense and not the [P]etitioner.'" In support, the Petitioner asserts that there was testimony from Mr. Cooper that Mr. Settles was the actual killer and that the reason Mr. Cooper did not testify at trial was because the police wanted him to testify untruthfully.

We respectfully disagree with the Petitioner's characterization of Mr. Cooper's testimony at the coram nobis hearing. Mr. Cooper testified, in contrast to his affidavit and letter, that Mr. Settles did not admit the murder to him. He mentioned nothing about having seen Mr. Settles with blood on his clothing. In fact, Mr. Cooper exhibited a suspicious lack of familiarity with the details contained in his affidavit and letter, repeatedly claiming that he could not remember the events from so long ago and stating that his mind was "shot." We agree with the coram nobis court that Mr. Cooper's claim that the police and Mr. Settles wanted him to fabricate a story about having seen three other men visiting the victim would, at best, have served to impeach Mr. Settles' credibility at trial and that it does not constitute newly discovered evidence establishing the Petitioner's innocence of the offenses. We also note that Mr. Settles was not the key witness against the Petitioner and that there were several other witnesses, in addition to Mr. Settles, who testified that the Petitioner either admitted the murder to them or that they saw him running from the crime scene and stopping to wash his hands. Accordingly, we conclude that the coram nobis court properly denied the petition for writ of error coram nobis.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the coram nobis court denying the petition for writ of error coram nobis.

_____
ALAN E. GLENN, JUDGE

-8-