IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2017

## STATE OF TENNESSEE v. ANDREW YOUNG JOHNSON

**Appeal from the Criminal Court for Sullivan County**
**No. S38912     R. Jerry Beck, Judge**

### No. E2017-00756-CCA-R3-CD

The petitioner, Andrew Young Johnson, appeals the denial of his petition for writ of error coram nobis, which petition challenged his 1998 convictions of attempted first degree murder and felony reckless endangerment. Discerning no error, we affirm the denial of coram nobis relief.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

David S. Barnett, Jr., Kingsport, Tennessee, for the appellant, Andrew Young Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Emily Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In 1998, a Sullivan County Criminal Court jury convicted the petitioner of one count of attempted first degree murder and one count of felony reckless endangerment. This court affirmed the convictions and accompanying 25-year sentence on direct appeal. *State v. Andrew Young Johnson*, No. E1999-00002-CCA-R3-CD, (Tenn. Crim. App., Knoxville, Apr. 18, 2000). The crimes in this case came on the tail end of a night the petitioner spent "drinking and partying with [Andrew] Birdwell, James Felty, and one other young man." *Id.*, slip op. at 2. While at Birdwell's house, "the [petitioner] showed the others a Derringer, a twenty-five millimeter semi-automatic pistol, and a nine millimeter Ruger semi-automatic pistol, all of which were on the [petitioner]'s person at Birdwell's house." *Id.* The young men traveled to a location on "Weaver Pike to shoot the guns," where "only the [petitioner] shot the nine millimeter

pistol." *Id.* "After shooting the guns, the group got back into the car, with Felty driving, and . . . . [a]s they were driving along Auburn Street, the [petitioner] told Felty to stop the car, which he did." *Id*. Once the car stopped, the [petitioner] got out of the car, fired his weapon, and then returned to the car. Mr. Felty drove away after the petitioner demanded that he do so, but when the petitioner asked to return to the scene of the latter shooting, "Felty told the [petitioner] he would have to drive himself, and Felty got in the backseat." *Id*. "When the [petitioner] got close to the house where he had fired the shots, he and his companions could see that the police were there, so the [petitioner] drove the car down a side street." *Id.*, slip op. at 3. Shortly thereafter, the petitioner crashed the car, and the four young men ran away, with Felty and his companion running in one direction and the petitioner, who was wearing a Michigan Wolverines jacket, and Birdwell, who was wearing a Kansas City Chiefs jacket, running in the other. *Id.*

Bristol Police Department Lieutenant Craig Beyer "responded to a call that shots had been fired in the Auburn Street area" and "was directed by neighbors to 101 Auburn Street, the residence of Mike Walling, who was inside the house at the time of the shooting." *Id*. Bullet holes riddled the house and a car parked in the rear of the house. Officer Gary Privette "received information . . . about the shooting at 101 Auburn and about the car accident on the nearby side street" and "learned that the four suspects included two black males wearing sports jackets." *Id*. Officer Privette joined in the search for the young men, and, after learning that two of the suspects had been caught, "[h]e reasoned that the two other suspects would have had time to reach Volunteer Parkway, so he drove in that direction." *Id*. "Soon, he spotted two black males in sports insignia-type jackets walking along the street" but "was unable to use his radio to alert backup because another officer had come on the radio at the same moment, and he could not get through." Officer Privette stopped his car, "'went to the rear of the vehicle,'" and drew his gun into "'a gun ready position'" angled toward the ground. *Id*. He ordered the men to "'get their hands up.'" The petitioner initially raised his hands, "'[a]nd then he went to say something, he dropped his hands down like this.'" *Id.*, slip op. at 4. The petitioner then "'dropped down behind a wall'" of "'timbers that was reinforcing a-like a flower bed'" and "'immediately came back up.'" *Id*. When the petitioner came up from behind the wall, he was holding his hands together and appeared to be aiming something at Officer Privette. Officer Privette said that when he "'heard two clicks," he "presumed it to be a weapon." *Id.*, slip op. at 5. The petitioner then went back behind the wall, and Officer Privette took cover behind the left tire of his patrol car. Before he could get into a position to see the two men, he "'heard the gun rack'" and gunfire started to strike the patrol car, shattering the window and puncturing the tire behind which Officer Privette had positioned himself. *Id*. Officer Privette testified that "[t]he individual shooting at him was wearing a blue and yellow Michigan State jacket that appeared mostly gray in the light. The other male was wearing a red and yellow jacket." *Id*.

Officer Harold Wayne Tucker responded "with Boris, his trained police dog," to a "location close to the scene of the gunfire to receive instructions." *Id.*, slip op. at 6. He went with the dog to a couple of different locations where the suspects had been spotted, and the "dog quickly picked up a trail that led to a construction trailer behind a red metal building." *Id.* Officer Tucker saw a "'white tennis shoe'" peak briefly out from under the trailer before he "'start[ed] hearing gunfire.'" *Id.* Boris came out from underneath the trailer and succumbed to the four gunshot wounds he had received. *Id.*, slip op. at 7. When Officer Tucker went to the ground himself, he saw "'two individuals under it,'" one of whom was holding "'a large frame automatic in his hand'" pointed "'towards where . . . back up officers were'" located. *Id.* "'[T]he one with the automatic said something about shooting someone'" and then pointed the gun at Officer Tucker. Officer Tucker, who feared for his life, fired a single round, causing the suspect holding the weapon to drop it to the ground. Officer Tucker recalled that the armed suspect wore "'a bluish jacket'" with "'couple of other colors,'" including "'yellow on'" it while the unarmed suspect wore "'a maroon jacket.'" *Id.*, slip op. at 8. He identified the one wearing the blue and yellow jacket as the petitioner. *Id.*

Officer Kenneth Smith recovered a 9mm Ruger pistol from underneath the construction trailer and "two other weapons from the [petitioner]'s person at the time of arrest-a Derringer and a twenty-five millimeter pistol.'" *Id.* Ballistics testing established that "[11] shell casings taken from Auburn Street; six shell casings [taken] from English Street where Officer Privette was fired on, as well as other shell casings taken from Williams Street in Bristol, Virginia; two bullets taken from the police dog at the Williams Street site; . . . and bullets taken from Officer Privette's police car" had all been fired from the 9mm Ruger recovered from underneath the construction trailer. *Id.*

On April 2, 2015, the petitioner placed in the prison mailing system a petition for writ of error coram nobis claiming entitlement to relief on grounds that newly discovered evidence cast doubt upon his guilt. He claimed that on April 2, 2014, he had received an audio recording of an interview with Mr. Birdwell and that the revelations in the interview indicated that the petitioner had not acted with premeditation. Specifically, he asserted that Mr. Birdwell told officers that he did not hear the petitioner's weapon click before the petitioner fired the weapon and that the petitioner told Mr. Birdwell that he had shot only at the police cruiser and not at Officer Privette. The trial court appointed counsel, and appointed counsel filed an amended petition for writ of error coram nobis that claimed due process tolling of the one-year statute of limitations for filing a petition for writ of error coram nobis because the State had withheld the Birdwell interview. The State asserted the statute of limitations as an affirmative defense, arguing that even if the recording had not been disclosed prior to trial, the petitioner had been aware of its contents since at least 2005. The State also asserted that the recording did not contain any evidence favorable to the petitioner.

-3-

At the March 9, 2017 hearing on the petition, the petitioner testified that he had been in continuous confinement since his arrest on February 12, 1996, beginning his stint of incarceration in federal custody. While in federal custody, he was transferred to several different facilities. At some point, a friend's wife was able to look through the record in his case, and she alerted him to the presence of the audio recording of Mr. Birdwell's interview. Thereafter, the petitioner arranged for his ex-wife, Mary Raykowitz, to obtain a copy of the recording from the Sullivan County District Attorney's Office. Ms. Raykowitz obtained the recording in May 2006. Ms. Raykowitz listened to the recording and alerted the petitioner to its potentially exculpatory contents, but federal prison officials would not allow the petitioner to possess the recording unless the petitioner received it directly from "the courts." The petitioner said that he did not file a petition for writ of error coram nobis based upon Ms. Raykowitz's assertions about the contents of the recording because he did not want to swear under penalty of perjury that her assertions were true and correct. The petitioner unsuccessfully endeavored to have the recording sent to him by his trial counsel, the district attorney's office, and the trial court. The petitioner said that he listened to the recording for the first time in April 2014, after he had been transferred to the Department of Correction ("TDOC").

The petitioner insisted that Mr. Birdwell's assertion that he did not hear clicking before the petitioner fired at Officer Privette negates the element of premeditation. He also maintained that, despite Mr. Birdwell's repeated assertions that the petitioner was the shooter, Mr. Birdwell had actually placed himself "in the position of the shooter" by admitting during the interview that he did not see the petitioner during the shooting.

During cross-examination, the petitioner acknowledged that the officer who interviewed Mr. Birdwell testified during a jury-out hearing at the petitioner's trial that he had interviewed Mr. Birdwell for an hour and a half. The petitioner said that he did not think trial counsel had been given a copy of Mr. Birdwell's interview because he did not share it with the petitioner. The petitioner claimed that he wanted Mr. Birdwell to testify, but trial counsel cautioned him that they should not call any witness unless they could be sure what the witness would say. He conceded that Mr. Birdwell would have testified that the petitioner shot at Officer Privette but nevertheless claimed that Mr. Birdwell's statement established that Mr. Birdwell was the shooter because "[h]e knew exactly what happened." The petitioner argued that Mr. Birdwell's rendition of events corroborated the petitioner's own assertion that he was not the shooter even though Mr. Birdwell repeatedly told the interviewer that the petitioner was, in fact, the shooter.

Former Sullivan County District Attorney General H. Greeley Wells, Jr., testified that he tried the petitioner's case with Assistant District Attorney General Mary

Katherine Harvey. Mr. Wells said that, upon a review of the petitioner's case file that included handwritten notes by Ms. Harvey, he learned that his office did not file a written response to trial counsel's request for discovery materials because the petitioner's trial counsel was not appointed until "less than a month before the trial date." Instead, because of time constraints, Ms. Harvey contacted trial counsel on May 21 or 22 and "provided him with the discovery material which included the interviews of witnesses." Mr. Wells had no "independent recollection that there was a tape recording of an interview with Mr. Birdwell." He said that, based upon his review of Ms. Harvey's notes, he had "no question that she met with" trial counsel and provided him with the requested discovery materials. Ms. Harvey's notes, which were exhibited to Mr. Wells' testimony, indicated that she copied for trial counsel "waivers, statements, incident reports, interviews, and test results that were done on ballistics."

Mr. Wells opined that none of the information contained in the recorded interview was exculpatory. He recalled that the petitioner presented a defense of "misidentification" and that Mr. Birdwell's statement did not support that defense. Mr. Wells also recalled that trial counsel did not present Mr. Birdwell as a witness but did bring Mr. Birdwell "into court . . . to . . . let the jury view him for the purpose . . . of seeing that he was similar in size or looks as to [the petitioner] because the defense in the case was it was a mistaken identity." Mr. Wells said that charges initially levied against Mr. Birdwell were later dismissed because "[t]here was no basis in fact for him being charged as a co-defendant."

The petitioner's trial counsel testified that he did not have a "specific recollection of receiving [the interview recording] in discovery," but he cautioned that he did not "have a specific recollection of receiving anything in discovery." Counsel agreed that the fact that Mr. Birdwell's interview was mentioned without counsel's objection during the petitioner's trial suggested that counsel was probably aware at the time that the recording existed. Trial counsel said that he no longer possessed the petitioner's case file given the age of the case. However, counsel did recall that the "thrust of [the] defense in the case" was misidentification, and he said that he would not have "assert[ed] a lack of identification while at the same time asserting an alternative theory that the [petitioner] actually did discharge a weapon, but had no intentions of doing harm to anybody." Counsel described the two defensive theories as "inapposite" and said that he could not say that he would have called Mr. Birdwell as a witness "given the fact that apparently he was willing to testify that [the petitioner] was the shooter." He explained, "I may have been prepared to cross-examine him, but I wasn't going to call him as a witness."

Trial counsel agreed that, "in isolation," he might "have used the statement that he didn't hear a 'click, click, click,' because that stands in contrast to apparently what the officer says. . . . But again, that's in isolation." He also agreed that Mr.

-5-

Birdwell's statement that the petitioner claimed he intended to only shoot at the car "in isolation . . . would go to his state of mind," but he stated, "I cannot say today that I would have tried to employ the strategy."

In the recording, which was exhibited to the hearing, Mr. Birdwell said that on the evening of the offense, he was at his mother's house watching television when the petitioner called and asked him to pick the petitioner up. Mr. Birdwell asked Jamie Felty, who had come over to hang out, to pick the petitioner up. Mr. Birdwell, Mr. Felty, and Adam McDavid went to pick up the petitioner and Nikolaus Johnson and returned to Mr. Birdwell's mother's house. Mr. Johnson left, but the petitioner remained. At some point, the petitioner displayed three guns that he had in a black backpack, offering to sell one of the guns to Mr. Birdwell's mother, who declined. Mr. Birdwell said that the petitioner did not tell him that the guns were stolen but that he "knew [the petitioner] didn't go out and buy it legally," adding, "I mean, I knew that for a fact. I just know Andrew." He said that the petitioner "wants to let everybody . . . think he's a thug, a gangster, crazy."

Between 10:30 and 11:00 p.m., the four left Mr. Birdwell's mother's house with Mr. Felty driving. Mr. Birdwell was wearing a Kansas City Chiefs Jacket while the petitioner was wearing either "a Notre Dame or Michigan jacket" that "was blue and white and yellow." Once in the car, the petitioner asked, "'Where can we go shoot off the gun?'" The young men then drove "pretty far down Weaver Pike." Mr. Felty stopped the car, and the petitioner rolled down his window and fired a 9 mm pistol until the clip was empty. Mr. Birdwell and Mr. McDavid fired a .25 pistol from the back seat, while Mr. Felty fired the "little bitty black gun" from the driver's side window.

After shooting the guns, the companions initially drove toward Mr. Birdwell's house, but the petitioner asked to be taken home first. The petitioner then began providing directions to Mr. Felty, who was still driving, but the directions did not take them to the petitioner's house. Instead, the directions took them to the residence of Mike Walling. At that point, the petitioner directed Mr. Felty to stop the car, and the petitioner "just got out the car, and he went out, and he just . . . starts shooting at the house. Starts shooting at the house." Mr. Birdwell insisted that none of the others "knew [the petitioner] was going to shoot at [Mr. Walling's] house." The petitioner then "ran back into the car." The petitioner denied to his "stunned" companions that he was intentionally firing at Mr. Walling's house, claiming, "'I had to waste my bullets so I could get some hollow points.'" He recalled that the petitioner "was hyped after he shot at the house."

They drove away, but Mr. Felty, who was shaken up, allowed the petitioner to drive. Mr. Birdwell insisted that the petitioner take him home. The petitioner then said, "'Well, let's see if there's any cops down here at . . . Mike Walling['s].'" Mr.

Birdwell demanded that the petitioner take him home because the police would be looking for their car. The petitioner ignored the request and drove toward Mr. Walling's house, where they saw several police cars. Upon seeing the police, the petitioner "took the first right he could before we got to Mike Walling's house and he sped up." The petitioner ran a stop sign, "[t]hen he saw this car coming off to this side, and he tried to slow down and then we just collided." Following the collision, none of the young men knew what to do, but Mr. Birdwell got out of the car and began walking down the street. After the accident, the petitioner had kept the 9mm pistol but dropped the back pack that contained the remainder of the guns and ammunition.

A short time later, Mr. Birdwell heard someone run up behind him, and he turned to see the petitioner. Approximately 15 minutes later, the petitioner and Mr. Birdwell were spotted by the police. The officer stopped his car, pointed his weapon at the petitioner and Mr. Birdwell, and ordered them to stop. Mr. Birdwell said that he put his hands up and got onto the ground as commanded, saying, "I didn't hear a 'click, click' or nothing. I just went down." While he was on the ground, Mr. Birdwell heard gunshots. When he looked up, he saw the patrol car but did not see the petitioner or the police officer who had stopped them. He said, "I was just waiting for the cop to come. I heard gunshots and I jumped a little bit and looked around and I ran. I didn't see the cop, didn't see [the petitioner]. . . . I took off running 'cause I didn't know what . . . was going on." Mr. Birdwell said that he did not know at that time that the petitioner had fired at the officer, "[b]ut later on I found out that he shot the police." As he ran away, Mr. Birdwell heard someone call his name and saw the petitioner "in this little ditch." Mr. Birdwell kept walking, and the petitioner followed.

As the young men walked, Mr. Birdwell asked the petitioner why he shot at the police officer, and the petitioner "act[ed] like it wasn't no big deal" and "he was calm about everything the whole time." The petitioner said, "'Look, don't be no punk, you know. Look, I got . . . you out of trouble with the police [indiscernible], you know.'" Mr. Birdwell said that the petitioner "was, like, 'Well, that cop didn't shoot back.'" When Mr. Birdwell asked the petitioner if he had shot the police officer, the petitioner said, "'No, I – just shot at the car.'" The petitioner "was scared after [the shooting at the police officer] 'cause he knew that sooner or later he was going to get caught." Nevertheless, the petitioner said, "'Look, you want to rush up at somebody's house?'" Mr. Birdwell declined, and the petitioner called him a punk. When Mr. Birdwell told the petitioner "how it was," the petitioner "left the house business alone and he kept following" Mr. Birdwell.

Mr. Birdwell acknowledged that the petitioner "had been into the crack'" and had been drinking gin on the night of the offenses. He also acknowledged that the

petitioner had often threatened to solve issues with people by getting his gun, but Mr. Birdwell "never thought he'd really try to kill nobody."

At the conclusion of the hearing, the coram nobis court implicitly accredited the petitioner's testimony that he filed his petition for writ of error coram nobis within one year of having first listened to the recording on April 2, 2014, and, as a result, agreed "to decide the issue on its merits rather than dismiss it" as untimely. Ultimately, however, the court denied relief: "One, I can't find that it's exculpatory from what I've heard; and two, I can't see where it would be helpful. And it certainly would be inconsistent with the defense at trial which was a defense of lack of valid identity of the [petitioner] as the shooter." In a later-filed written order, the court specifically accredited "the testimony of DA Wells" and concluded that "[t]he allegation that the district attorney withheld Birdwell's statement is without merit." The court found that "[c]redible proof indicates" that the district attorney's office provided the recording of Mr. Birdwell's interview to trial counsel prior to trial. The court also concluded that Mr. Birdwell's statement was not exculpatory because Mr. Birdwell's "statement established the [petitioner] as the shooter" in direct contravention of the mistaken identity defense offered at trial. As a result, the court ruled, "there was not a reasonable probability that the alleged newly discovered evidence might have resulted in a different judgment."

In this appeal, the petitioner claims that the trial court erred by refusing to find a due process violation based upon the State's suppression of Mr. Birdwell's statement.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Coram nobis relief is provided for in criminal cases by statute:

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2006); *see State v. Vasques*, 221 S.W.3d 514, 525-28 (Tenn. 2007) (describing standard of review as "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different'" (citation omitted)). The grounds for seeking a petition for writ of error coram nobis are not limited to specific categories but may be based upon any "newly discovered evidence relating to matters which were litigated at the trial" so long as the petitioner also establishes that the petitioner was "without fault" in failing to present the evidence at the proper time. T.C.A. § 40-36-105(b).

"The writ of error [coram nobis] may be had within one (1) year after the judgment becomes final by petition presented to the judge at chambers or in open court . . . . ." T.C.A. § 27-7-103; *Mixon*, 983 S.W.2d at 670. In coram nobis cases, however, the statute of limitations is an affirmative defense that should be raised by the State in the trial court. *See Harris v. State*, 102 S.W.3d 587, 593 (Tenn. 2003) (citing *Sands v. State*, 903 S.W.2d 297, 299 (Tenn. 1995)).

Although the decision to grant or deny coram nobis relief rests within the sound discretion of the trial court, *see Vasques*, 221 S.W.3d at 527-28, "[w]hether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness," *Harris v. State*, 301 S.W.3d 141, 145 (Tenn. 2010).

Even assuming for the sake of argument that the petitioner did not become aware of the recording until 2005 and was unable to listen to it until April 2014 as he claims, he has failed to establish entitlement to coram nobis relief. Mr. Birdwell's statement is not in any way exculpatory and might actually best be described as damning. Mr. Birdwell's statement tracks nearly exactly the proof at the petitioner's trial as summarized by this court on direct appeal. Mr. Birdwell stated that the petitioner possessed all the weapons and that the weapons were stolen. He also indicated that the petitioner had previously indicated a willingness to solve problems by getting his gun. He also acknowledged that the petitioner "had been into the crack" and had been drinking gin on the night of the offenses. Mr. Birdwell said that the petitioner orchestrated the shooting at Mr. Walling's house and that the petitioner demanded to drive thereafter because he wanted to see how many police officers had responded to the shooting. Mr. Birdwell maintained throughout his statement that it was the petitioner who fired at Officer Privette and that the petitioner had done both shootings in an attempt to prove himself a real gangster. Mr. Birdwell stated that, after shooting at Officer Privette, the petitioner wanted to "'rush up at somebody's house'" and hide out from the police. In light of the mountain of incriminatory information contained within the statement, that Mr. Birdwell said he did not hear the petitioner's gun click before he fired upon Officer

Privette is of no consequence.  The petitioner's claim that Mr. Birdwell's statement in any way suggests that Mr. Birdwell, and not the petitioner, was the shooter is nothing short of ludicrous.  Certainly nothing suggests that had Mr. Birdwell's statement "'been presented at trial, the result of the proceedings might have been different.'" *Vasques*, 221 S.W.3d at 527.

Accordingly, we affirm the judgment of the coram nobis court.

_____
JAMES CURWOOD WITT, JR., JUDGE